William Glen Boyd was charged in an eight-count indictment with the capital murders of Fred and Evelyn Blackmon. Four counts of the indictment charged the appellant with murder during the course of a kidnaping, and the other four counts charged him with murder during the course *Page 1249 
of a robbery. The jury found the appellant guilty on each count of the indictment. At the sentence phase of the trial, the jury recommended that the appellant be sentenced to life without parole by a seven to five vote. The trial judge rejected the jury's recommendation and sentenced the appellant to death.
Julie Greenwood, Evelyn Blackmon's daughter, testified that on March 26, 1986, she was living with her mother and her mother's husband, Fred Blackmon, at 401 Fairway Drive in Anniston. When Julie Greenwood left for school that particular morning, both Mr. and Mrs. Blackmon were at home.
After school that day, Julie went to a friend's house and then to the appellant's house to get some tapes. Julie had dated the appellant for a couple of years until the two broke up in February of 1986.
Julie went home at 9:30 p.m. When she arrived home, neither Mr. nor Mrs. Blackmon was home. Mr. Blackmon's black Cadillac Eldorado was not at the house either. Julie went to bed soon after she got home.
The next morning, Fred and Evelyn Blackmon still had not returned home. Julie became worried and told her father, Wayne Greenwood. The next afternoon, Julie and her father filed a missing person's report with the Anniston, Alabama, Police Department.
In October of 1986 Julie went to see the appellant in the jail. He told her that he had a letter which would explain everything. However, the appellant never gave her a letter. He told her that she would be surprised to learn who was involved in the murders but he would not give her any names.
Julie went to see the appellant a second time in the jail. He told her that a gang was involved in the murders and they had threatened that, if he did not do what they said, the gang would kill Julie and Evelyn Blackmon.
Julie testified that two telephones were missing from the Blackmon house on March 26, 1986. She stated that the phones were tapped because someone had been calling Mr. Blackmon and saying things about Mrs. Blackmon. Julie testified that the appellant knew this and that he had been in the Blackmon house on numerous occasions in the past.
Officer Ken Murphy of the Anniston Police Department testified that he was patrolling Fairway Heights at approximately 8:40 on the morning of March 26, 1986. At this time, Murphy noticed a 1976 white, two-door, Chevrolet Camaro illegally parked near the intersection of Sunset and Fairway Drives. The tag number of this vehicle was Alabama 11K-9970. This car was parked approximately one-quarter of a mile away from the Blackmon house.
Linda Jenkins, the operations officer at the Quintard branch of First Alabama Bank in Anniston, testified that she knew Fred Blackmon and saw him several times a week. She stated that on the morning of March 26, 1986, Mr. Blackmon drove up to the drive-in window. A slender, white male with long dark hair was with Mr. Blackmon in the car. Mr. Blackmon presented a check in the amount of $5,000. When Jenkins saw Mr. Blackmon, she spoke to him but he did not reply. Then Jenkins said, "Fred, this is Linda. How are you doing?" (R. 387.) He just looked at her and nodded.
Jenkins approved the check and Mr. Blackmon received $5,000 in $100 bills. Jenkins stated that Mr. Blackmon's behavior was not normal that day.
Ellen Bass was the teller at the drive-in window that morning. Her testimony was substantially the same as Jenkins' testimony.
Alvin Gibbs, the commissioner of licenses for Calhoun County, testified that a 1985 black Cadillac Eldorado, tag number 11P-2864, was registered to Fred Blackmon. He also testified that a 1976 white Chevrolet Camaro, tag number 11K-9970, was registered to this appellant.
Eugene Hunt Scheuerman testified that he was a medical examiner with the Department of Forensic Sciences in March of 1986. He stated that he was present when a black Cadillac Eldorado, tag number 11P-2864, *Page 1250 
was pulled from the Coosa River. The body of Fred Blackmon was removed from the trunk of this vehicle. Fred Blackmon was identified by the use of dental records.
Scheuerman performed the autopsy on Fred Blackmon's body. Mr. Blackmon's clothing was soiled, muddy, and wet when it was removed from the trunk of the vehicle. There was a strip of white cloth on Mr. Blackmon's body which was used as a gag. Three holes were present on Mr. Blackmon's shirt. Two gunshot wounds were found on Mr. Blackmon's body. One of the gunshots penetrated the neck and passed into the chest cavity. The other gunshot penetrated the left side of the chest and passed through the heart. Both of these projectiles were recovered. The weapon which caused these gunshot wounds was fired at close range.
Scheuerman also found minor blunt force injury to Mr. Blackmon's head. However, he determined Mr. Blackmon's cause of death to be the gunshot wounds to the chest and neck.
Dr. Joseph Embry, a forensic pathologist with the Department of Forensic Sciences, testified that he was present when a 55-gallon barrel was pulled from the Coosa River. The body of Evelyn Blackmon was found inside the barrel. She was identified through the use of head x-rays. Cinder blocks and bricks were also found in this barrel.
Embry performed the autopsy on Mrs. Blackmon's body. There was a gag in Mrs. Blackmon's mouth and a piece of cloth tied around her ankles. Mrs. Blackmon sustained three gunshot wounds. One of the wounds was to the head and it was a superficial wound. Another one of the wounds was to the right side of the neck. The other wound was to the back. None of the projectiles which caused these wounds was found in Mrs. Blackmon's body.
Mrs. Blackmon also sustained a laceration of her right forehead. She had numerous fractures to her nose and face. Mrs. Blackmon also had a chop wound in her lower back which penetrated her backbone. Mrs. Blackmon's cause of death was due to the two gunshot wounds to her neck and back.
Charles Hall, an officer with the Anniston Police Department, testified that he arrested the appellant for kidnaping in the first degree on April 3, 1986 at 3:25 p.m. at 701 Mulberry Street in Anniston. The appellant was arrested in front of his house as he arrived home in his Camaro. Hall drove the appellant's car to the city impound lot and secured it. He gave the key to the car to Sergeant Robertson.
Gary Carroll, an investigator with the Anniston Police Department, testified that the appellant made a statement to him on April 3, 1986 at 5:00 p.m. Before this statement was made, the appellant was advised of his Miranda rights and he signed a waiver of those rights. No threats, promises, hopes of reward, or other inducements were made to obtain the appellant's statement.
The following is a summary of the appellant's statement.
On the morning of March 26, 1986, the appellant and Robert Milstead went to the home of Fred and Evelyn Blackmon. The two had discussed getting money from the Blackmons. The appellant parked his 1976 white Camaro several blocks away from the Blackmons' house. Milstead went in the Blackmons' house first and held a gun on the Blackmons while the appellant came in the house. Both Milstead and the appellant had guns. One was a .25 caliber and the other was a .22 caliber gun. Mr.Blackmon agreed to get Milstead and this appellant money from his bank. Mr. Blackmon wrote out a check and the appellant accompanied him to the bank. A check in the amount of $5,000 was cashed at the bank and Mr. Blackmon gave the money to the appellant and they returned to Blackmon's house.
Once they got back to the house, the appellant and Mr. Blackmon, along with Milstead and Mrs. Blackmon, left the house in Mr. Blackmon's Cadillac Eldorado. Before leaving the house, the appellant took phones from the kitchen and upper bedroom *Page 1251 
because he knew the phones had been tapped.
Milstead drove the car and Mr. Blackmon sat in the front seat with Milstead. Mrs. Blackmon sat in the back seat with the appellant. They drove to Ohatchee and went down a dirt road to a spot on the river. The appellant said that they planned to tie the Blackmons up and leave them and he and Milstead were going to leave the state. Milstead took Mrs. Blackmon into the woods. When the appellant heard Mrs. Blackmon scream, he went into the woods. The appellant stated that Milstead hit Mrs. Blackmon from behind with a log and then he shot her. They left Mrs. Blackmon tied up there.
The two decided to knock Mr. Blackmon out and leave him. The appellant hit Mr. Blackmon on the head with a stick. Milstead then said they had to kill him and Milstead shot Mr. Blackmon. Mr. Blackmon's body was then put in the trunk of his car.
Milstead and the appellant then drove Mr. Blackmon's car to a grocery store parking lot and left it there until after dark. The two went back and picked up the car and drove it back to the river. They then drove the car off a boat ramp into the river.
The next morning, Milstead purchased some 55-gallon barrels. The appellant and Milstead then went back to the place where they left Mrs. Blackmon. They put Mrs. Blackmon's body into one of the barrels along with rocks to weigh it down. They then rolled the barrel into the river.
The appellant stated that he and Milstead split the money in half. He said that the guns he and Milstead had were thrown in a creek in Ohatchee.
On April 4, 1986, the appellant gave another statement to the police. The statement consisted of a detailed description of how to find the locations of the crime scenes.
On April 11, 1986, the appellant took the police to the place where the guns were thrown into the creek. The guns were found in the creek.
Bryan Watson, an evidence technician with the Anniston Police Department, testified that the scene where Mrs. Blackmon was killed was located on April 3, 1986. The scene consisted of a dirt road which ended at a brush pile in the woods. There were vehicle tire tracks on the dirt road which ended at the brush pile. There were two distinct footprints found parallel to the tire tracks. A drag trail was found leading from the tire tracks into the woods. At this scene, Watson found a liberal sampling of bleached hair with white fiber entwined in the hair. Several white and yellow entwined fibers were also found at the scene. Watson also collected soil and debris samples which contained blood stained leaves and soil. A spent .25 caliber hull was found close to the blood stained area. Watson collected and secured this evidence.
On April 4, 1986, Watson went to a cement boat ramp located about 3/4 of a mile from the first scene. A 1985, two-door Cadillac Eldorado, Alabama tag number 11P-2864, was recovered from the river at this site. The windows were down and the doors were unlocked. A single key was in the ignition and the ignition was in the on position. The car was in first gear. The lights and radio were off. The right rear taillight was broken and there was damage to the front fender.
The scene where Mr. Blackmon was killed was also found that day. The scene was a dirt road. At this scene, several pieces of a taillight lens were found as was a silver Cadillac emblem. Two spent .25 caliber hulls were found here. A long white fiber was also located here. This evidence was collected.
On April 7, 1986, Watson obtained the key to the appellant's car and inventoried the contents of the vehicle. The vehicle was located in the police department's fenced and locked impound area. The windows were up and the doors were locked. Watson photographed the car and then conducted an inventory of the vehicle in compliance with the policies of the Anniston Police Department. Watson followed the standard inventory procedures for impounded vehicles. *Page 1252 
Inside the car, Watson found a piece of white and yellow entwined cloth on the front floorboard of the car. One end of the cloth was knotted and there was hair entwined in the knot. A black mesh shirt, a pair of blue underwear, a black jacket, and another piece of cloth were also found in the right front floorboard.
Watson also found a roll of gauze in the console of the car along with a yellow gold necklace inside an envelope. The necklace was identified as belonging to Mrs. Blackmon. Two spent .22 caliber hulls were found on the dashboard.
On April 9, 1986, Watson went to a site on the Coosa River where a barrel had been recovered. This site was close to the initial crime scene, where Mrs. Blackmon's body was found.
On April 11, 1986, the appellant told the police where the guns that were used on March 26, 1986, had been thrown. A nickel plated Raven Arm Company .25 caliber automatic pistol and a black .22 caliber pistol were found at this location. Only one round was in the .25 and there were five live rounds in the .22 pistol.
Richard Townsley, an officer with the Anniston Police Department, went to the Wood's Body Shop on April 5, 1986. Mr. Blackmon's car was taken there and impounded after it was pulled from the river. Townsley compared the pieces of a taillight found on the dirt road to the missing portion of the taillight on Mr. Blackmon's car. The pieces matched.
That same day, Townsley went to Milstead's house at 515 Dixie Avenue in Anniston. A blue metal barrel and an ax were found in the backyard.
Larry Huys, a serologist with the Department of Forensic Sciences, testified that the soil samples given to him from the place where Mrs. Blackmon was killed contained type A blood. Stains on the articles of clothing found in the appellant's car tested positive for blood.
David Higgins, a firearms and toolmarks examiner for the Department of Forensic Sciences, testified that the two bullets found in Mr. Blackmon's body and the three expended cartridges found at the murder scenes were fired from the .25 caliber pistol found in the creek. Higgins could not check for toolmarks comparison between the ax found in Milstead's backyard and the barrel removed from the river because the barrel was rusty.
John Case, a criminalist with the Department of Forensic Sciences, testified that he examined numerous pieces of evidence collected in this case. He stated that the hair samples collected at the scene where Mrs. Blackmon was killed matched the known scalp hair of Mrs. Blackmon. The hair found in the appellant's car had some similarities to Mrs. Blackmon's hair. The cloth found on the floorboard of the appellant's car was the same fabric as the ligatures from the ankles and head of Mrs. Blackmon and the gag on Mr. Blackmon. Case also testified that some blue smears found on the ax from Milstead's back yard were consistent with scrapings of the barrel which was recovered from the river.
Kenny Surrett testified that he is a friend of the appellant and grew up with him. He stated that he was with the appellant and Milstead the night before the murders took place. Surrett saw a silver .25 caliber gun and a .32 caliber gun in the appellant's car.
On March 27, 1986, Surrett went by the appellant's house to talk to him about some money the appellant owed him. When Surrett arrived, the appellant came out of the bathroom and said he could not believe how cold-blooded he was.
Then the appellant said he had something to tell Surrett. He said he and Milstead went to the Blackmons' house on the morning in question. The appellant took Mr. Blackmon to the bank and Mr. Blackmon got some money. Milstead and the appellant then took the Blackmons to the river. The appellant said Milstead hit Mrs. Blackmon in the nose and then shot her a couple of times. Later, the two broke Mrs. Blackmon's back and put her in a barrel which they pushed into the river.
The appellant said he hit Mr. Blackmon with a stick and then shot him. They put *Page 1253 
Mr. Blackmon's body into the trunk of his car and drove it into the river.
After the appellant finished talking, Surrett noticed some money on a table. The appellant said he got the money from Mr. Blackmon and paid Surrett the money he owed him.
The next week, the appellant called Surrett and asked him if he had heard the news about the Blackmons being missing. The appellant asked Surrett if he believed his story now. Surrett told the appellant that he did not want to hear it, and it was not something to joke about.
The next day, Surrett was with the appellant at the barber shop. The appellant made a joke that the Blackmons might be at the bottom of the river. The following day, Surrett told the appellant that he had told somebody about what the appellant told him. The appellant was mad.
Robert Denton Milstead testified that he pleaded guilty to four counts of capital murder in connection with the Blackmons' deaths. He received a life sentence in exchange for his testimony at this trial.
On March 24, 1986, the appellant told Milstead that he was going to blackmail Mrs. Blackmon with names of the men she had slept with while she was married to Mr. Blackmon. He said he was then going to sell the names to Mr. Blackmon. He did not mention anything about kidnaping the Blackmons. Milstead did not know the Blackmons.
On the morning of March 26, 1986, the appellant and Milstead drove by the Blackmons' house and then parked the appellant's car several blocks away. The appellant gave Milstead a .25 caliber gun and told him to go to the Blackmons' house and hold them until he came in the house. The appellant said the Blackmons would not let him in if he went to the door.
Milstead put the gun in his pants and knocked on the Blackmons' door. Mr. Blackmon came to the door with his pajamas on and let Milstead in. Milstead said he was a friend of Julie Greenwood and he had to talk to Mrs. Blackmon about her daughter's safety. Milstead then went downstairs to see Mrs. Blackmon. He told her that the appellant was on a "rampage" and he was scared the appellant would hurt her daughter. Milstead and Mrs. Blackmon then went upstairs and the appellant came in the house.
The appellant then put a .22 revolver to Mrs. Blackmon's head. Mrs. Blackmon told her husband to call the police. The appellant said it would not be a wise thing to do and told the Blackmons to sit down. He told Milstead to hold the gun on them and he then went into the kitchen and ripped a pillow case into pieces. The appellant then tied up Mrs. Blackmon and gagged and blindfolded her.
The appellant went back to the kitchen and pretended to dial a number on the phone. He said, "We're in here and everything is going ok. If I call you back and let the phone ring once, kill Julie and get out." (R. 713.) The appellant then told Mr. Blackmon that Julie was a hostage and he wanted $75,000. Mr. Blackmon said he did not have that much money that he could get to because his money was tied up in stocks. The appellant then agreed to take $5,000. The appellant went upstairs with Mr. Blackmon while he changed his clothes, then the appellant and Mr. Blackmon went to the bank. Milstead stayed with Mrs. Blackmon. The appellant and Mr. Blackmon returned from the bank with $5,000 in $100 bills. The appellant later gave Milstead half of this money.
The appellant told Milstead that they were going to take the Blackmons to a secluded spot, tie them up and leave them so he and the appellant could get out of the state.
The four then left in Mr. Blackmon's Eldorado. Before they left the house, the appellant took $1,500 from Mr. Blackmon's wallet and one of Mrs. Blackmon's gold necklaces which the appellant later left in his car. The appellant also took some phones because he knew they were tapped.
Milstead drove the car and Mr. Blackmon sat beside him in the front seat. The appellant and Mrs. Blackmon sat in the back seat. Milstead drove across the Coosa River to Ohatchee (in St. Clair County) and *Page 1254 
drove down a dirt road. At some point, the appellant, Milstead, and Mrs. Blackmon got out of the car and walked to a clearing behind a brush pile. The appellant then told Mrs. Blackmon to sit down. He tied her hands and feet, gagged and blindfolded her. After talking to Mrs. Blackmon, the appellant hit her on the nose with a stick and then hit her on the forehead. Mrs. Blackmon screamed and the appellant tried to choke her with a cloth. The appellant then took the .22 gun, muffled it with the cloth and shot Mrs. Blackmon. The shot did not kill her so the appellant took the .25 gun from Milstead and shot Mrs. Blackmon in the back and head. They covered Mrs. Blackmon's body up and left.
Milstead and the appellant then took Mr. Blackmon back across the river (into Calhoun County) and parked on a dirt road. The appellant told Mr. Blackmon to get out of the car. The appellant hit Mr. Blackmon on the head with a stick. This hit broke the taillight on Mr. Blackmon's car. Then the appellant took a piece of cloth and started choking Mr. Blackmon. Mr. Blackmon struggled and stabbed the appellant with a stick. The appellant took out the .25 gun and put it to Mr. Blackmon's throat. Mr. Blackmon begged the appellant not to shoot him and said he could get $50,000 for him. The appellant told Mr. Blackmon it was too late and shot him in the chest and neck. Milstead and the appellant then put Mr. Blackmon's body in the trunk. Milstead and the appellant then drove Mr. Blackmon's car to the Piggly Wiggly grocery store lot and parked it there. They went to Milstead's father's house and washed up and changed clothes. Later that night, Milstead and the appellant went back and picked up Mr. Blackmon's car and drove it to a boat ramp on the Coosa River. The appellant rolled the windows of the car down and rolled the car down the ramp into the river. After a few minutes, the car sank. They threw the two pistols in a creek that night.
The next morning, Milstead and the appellant went back to the place where they left Mrs. Blackmon's body. They were going to put her body in a barrel that Milstead bought the previous afternoon. The appellant said the body was too stiff and he took Milstead's ax and tried to cut Mrs. Blackmon's body in half. He then took the body and broke Mrs. Blackmon's back. The two then put her body into the barrel with some cement blocks and rocks. The appellant cut some holes in the barrel with the ax. Milstead and the appellant then rolled the barrel into the river and it sank.
The appellant told Milstead to tell the police a story about the mafia if he was questioned concerning the Blackmons' deaths. He said that Milstead would wind up like Mrs. Blackmon if he said anything to the police about him.
Milstead testified that he had a conversation with Sharon Johnson on the day the murders occurred. Milstead told Johnson that he and the appellant kidnapped the Blackmons and that the appellant killed them.
Sharon Johnson testified for the defense. She said that she had a conversation with Milstead on March 26, 1986. Milstead told her that he shot Mrs. Blackmon and the appellant shot Mr. Blackmon. She said she saw the appellant that day with $3,000 in cash. She and the appellant were dating at the time.
 I
On the afternoon of April 3, 1986, the appellant was arrested for kidnaping in the first degree as he drove up to and parked his automobile in front of his house at 701 Mulberry Street in Anniston, Alabama. The police took the appellant into custody and impounded his vehicle. The vehicle was taken to the Anniston Police Department's impound area. This area was fenced and locked. The vehicle's windows were up and the doors were locked.
On the morning of April 7, 1986, Officers Watson and Bradley conducted an inventory search of the appellant's vehicle according to the standardized procedures of the Anniston Police Department. All of the contents of the vehicle were inventoried. During the course of the inventory, Watson and Bradley seized certain items which circumstantially *Page 1255 
linked this appellant to the Blackmons' deaths.
At trial, the appellant objected to the admission of these items of evidence on the ground that they were illegally seized during a warrantless search of his vehicle. He contends on appeal that this search was unreasonable and in violation of the Fourth Amendment to the United States Constitution.
In South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092,49 L.Ed.2d 1000 (1976), the United States Supreme Court recognized an inventory search exception to the warrant requirement of the Fourth Amendment. Colorado v. Bertine, 479 U.S. 367,107 S.Ct. 738, 93 L.Ed.2d 739 (1987); Ringer v. State, 489 So.2d 646
(Ala.Cr.App.), cert. denied 489 So.2d 646 (Ala. 1986); Lippoldv. State, 365 So.2d 1015 (Ala.Cr.App. 1978), cert. denied,365 So.2d 1022 (Ala. 1979).
In Opperman, the United States Supreme Court ruled that inventories of lawfully impounded vehicles which are conducted pursuant to standard police procedures are reasonable under the Fourth Amendment.
Here, both officers testified that the inventory search of the appellant's vehicle was conducted according to standard procedures of the Anniston Police Department. The fact that the inventory was conducted some four days after the vehicle's impoundment does not necessarily render the inventory search unreasonable. See Cooper v. California, 386 U.S. 58,87 S.Ct. 788, 17 L.Ed.2d 730 (1967) (the Supreme Court upheld an inventory search which was carried out one week after the defendant's arrest and the vehicle's impoundment). During the four days between the appellant's vehicle's impoundment and the inventory of its contents, the Anniston Police Department was locating the various sites at which the events of this case took place. Officer Watson was involved in the collection of evidence found at these sites. Certainly, the discovery and preservation of evidence, found where each of the killings took place, were more important at the time than the inventory of the contents of the appellant's vehicle, which was properly secured.
Under these circumstances, we cannot say that the inventory search of the appellant's vehicle four days after its impoundment was unreasonable.
The appellant also claims that the inventory search of the appellant's vehicle was a subterfuge for obtaining evidence in this case. Officer Bradley testified that police are always aware that they may find incriminating evidence when conducting an inventory search. However, ". . . the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search. United States v. Prescott, supra, 599 F.2d [103] at 106." Ringer, 489 So.2d at 649 (quoting United Statesv. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982).
In Bertine, the Supreme Court upheld an inventory search of the defendant's vehicle where "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." Bertine,107 S.Ct. at 742. The court concluded that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment. . . ." Bertine,107 S.Ct. at 742.
On the afternoon of March 28, 1986, some two days after Mr. and Mrs. Blackmon disappeared, Julie Greenwood and her father, Mr. Greenwood, filed a missing persons report with the Anniston Police Department.
In the case at bar, there was no showing that the officers acted in bad faith or conducted the inventory for investigative purposes. The police had probable cause to believe that the appellant's vehicle had been used in the commission of the crimes. This probable cause was supplied by the accomplice, Milstead, who had given the police a detailed statement several hours before the appellant was arrested as he drove up in front of his home. See State v. Stott, 395 So.2d 714 (La. 1981). Thus, we conclude that the inventory search of the appellant's vehicle was reasonable and not in violation of the United *Page 1256 
States Fourth Amendment. (Authorities herein cited.)
 II
The evidence adduced at the appellant's trial showed that Mrs. Blackmon's death and murder occurred in St. Clair County, Alabama. The appellant argues on appeal that he should have been tried in St. Clair rather than Calhoun County for Mrs. Blackmon's murder since the killing took place in that county.
Section 15-2-2, Code of Alabama (1975) states that: "Unless otherwise provided by law, the venue of all public offenses is in the county in which the offense was committed." (Emphasis added.)
Section 15-2-6, Code of Alabama, provides that: "When an offense is committed partly in one county and partly in another or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, venue is in either county."
In Ex parte Williams, 383 So.2d 564 (Ala. 1980), cert. denied,Williams v. Alabama, 449 U.S. 995, 101 S.Ct. 534,66 L.Ed.2d 293 (1980), the Alabama Supreme Court examined the language of § 15-2-6, Code of Alabama (1975). In that case, the court stated:
 "Obviously, the phrase, 'or requisite to the consummation of the offense' means requisite to the completion of the offense — to the achievement of the unlawful purpose — to the ends of the unlawful enterprise. By the use of the word 'consummation' the legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense — that is, to the achievement of the unlawful purpose of the person committing the offense."
Williams, 383 So.2d at 566 (quoting People v. Megladdery,40 Cal.App.2d 748, 106 P.2d 84 (1940).
The appellant was charged with two counts of kidnaping/murder and two counts of robbery/murder involving the death of Mrs. Blackmon. In Ex parte Baldwin, 456 So.2d 129
(Ala. 1984), the Alabama Supreme Court, interpreting the 1975 capital murder statute stated:
 "The crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating with the act of intentionally killing the victim. The offense consists of two elements, robbing and intentionally killing, but does not consist of two separate offenses. See Ex parte Clements, 370 So.2d 723 (Ala. 1979); Horsley v. State, [374 So.2d 363] (Ala.Crim.App. 1978)."
Baldwin, 456 So.2d at 133.
Although the language in the present 1981 capital murder statute defining robbery/murder differs somewhat from the earlier statute, the offense of robbery/murder is still a single offense consisting of two elements. The capital offense of robbery/murder cannot be consummated unless there is a 1) murder committed by the defendant, 2) during the course of a robbery in the first degree or an attempt thereof. The capital offense of kidnaping/murder likewise is a single offense consisting of two elements — 1) a murder committed by the defendant, 2) during the course of a kidnaping in the first degree or an attempt thereof.
As was stated earlier, the appellant was charged with two counts of kidnaping/murder (counts I III) with regard to Mrs. Blackmon's death.
Section 13A-6-43(a), Code of Alabama (1975) provides that:
 "A person commits the crime of kidnaping in the first degree if he abducts another person with intent to
(1) hold him for ransom or reward; or
(2) use him as a shield or hostage; or
 (3) accomplish or aid the commission of any felony or flight therefrom; or
 (4) inflict physical injury upon him, or to violate him sexually; or
(5) terrorize him or a third person; or
 (6) interfere with the performance of any governmental or political function." *Page 1257 
Count I of the indictment charged the appellant with the murder of Mrs. Blackmon during an abduction of her with the intent to inflict physical injury upon her. Count III of the indictment charged the appellant with the murder of Mrs. Blackmon during an abduction of her with the intent to terrorize her.
The definition of "abduct" as it relates to § 13A-6-43, Code of Alabama (1975) is as follows:
 "To restrain a person with intent to prevent his liberation by either:
 a. Secreting or holding him in a place where he is not likely to be found, or
 b. Using or threatening to use deadly physical force."
Ala. Code, § 13A-6-40(2) (1975).
"Restrain" is defined as follows:
 "To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is 'without consent' if it is accomplished by:
 a. Physical force, intimidation or deception. . . ."
Ala. Code, § 13A-6-40(1) (1975).
Applying the above definitions to the case at bar, there is ample evidence that the offense of kidnaping (the abduction of Mrs. Blackmon by the appellant with the intent to 1) inflict physical injury upon her, and 2) terrorize her) occurred in Calhoun County, Alabama. The abduction of Mrs. Blackmon was a requisite to the completion of the capital offense of kidnaping/murder. Thus, venue was properly in Calhoun County, Alabama, with regard to counts I and III of the indictment (kidnaping/murder).
The appellant was also charged with two counts of robbery/murder in counts V and VII of the indictment.
 "A person commits the crime of robbery in the first degree if he violates § 13A-8-43, and he
 (1) Is armed with a deadly weapon or dangerous instrument; or
(2) Causes serious physical injury to another."
Ala. Code, § 13A-8-41(a) (1975).
Section 13A-8-43(a), Code of Alabama (1975) provides:
 "A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 (1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance, or
 (2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
In count V of the indictment, the appellant was charged with the murder of Mrs. Blackmon during the course of a robbery (of the Cadillac and $5,000) while armed with a deadly weapon. Obviously, the robbery element, as alleged in count V was completed in Calhoun County, Alabama, when the appellant and Milstead obtained unauthorized control of the $5,000 and the Cadillac automobile while armed with deadly weapons.
Count VII of the indictment charged the appellant with the murder of Mrs. Blackmon during the course of a robbery, and during said robbery, he caused serious physical injury or death to her. Although there was no evidence that the appellant caused Mrs. Blackmon serious physical injury or death in Calhoun County, venue is still proper in Calhoun County with regard to count VII of the indictment. The theft of the Cadillac and the $5,000 by the threat or use of force against Mrs. Blackmon by the appellant, was an act requisite to the completion of the offense of robbery/murder. Although the robbery element as contained in count VII was consummated in St. Clair County, it began in Calhoun County.
From our examination of § 15-2-6, Code of Alabama (1975), and the Alabama Supreme Court's interpretation in Williams, of the language used in this statute, we conclude that venue, for the kidnaping/murder *Page 1258 
and robbery/murder charges against this appellant for the death of Mrs. Blackmon, was properly in Calhoun County, Alabama.
 III
During the course of the jury's deliberations during the guilt phase of trial, the following occurred:
 "THE COURT: Let the record reflect the jury is outside the courtroom. Counsel for the defendant and the state are present.
 "I have received a note from the jury which reads: 'Could we have a distinction between murder and capital murder?' I have responded: 'Murder and capital murder have already been defined to you. You should use your own recollection of those definitions to determine any distinction.'
"What says the state?
"MR. FIELD: Satisfied, Your Honor.
"THE COURT: What says the defendant?
"MR. PARIS: Satisfied, Your Honor.
"THE COURT: I'll send the note back up." (R. 961.)
The appellant asserts in his brief that a proper objection was made to the trial court's refusal to give additional instructions on murder and capital murder. The only evidence concerning this matter which is contained in the record before us is the above-quoted portion of the record, a motion to correct or modify the record filed with the trial court and an order by the trial court denying this motion. The order of the trial court, dated July 10, 1987, states that a hearing was held on the appellant's motion. The order further states that the trial judge, after hearing testimony from both sides and reviewing the court reporter's notes and tapes of the trial, found that "any objections made by the Defense Counsel to the Court's response to the question submitted by the Jury to the Court were not preserved for the record." Thus, the evidence before this court is that the appellant failed to object to the court's refusal to give additional instructions to the jury, and, therefore, counsel had not preserved this issue for our review.
The appellant has attached to his brief a motion to extend the record on appeal (appellant's brief, p. 39-40), and copies of affidavits made by the appellant's attorneys (appellant's brief, p. 43-45). In the affidavits made by counsel, Brian Stephen Levinson, he states:
 "On March 20, 1987, in the midst of appellant's trial, I was present and objected to the trial judge's failure to recharge the jury as to capital murder and murder, after the jury asked for a distinction of the two, and I also objected to the trial judge's failure to inquire of the jury what the basis of their inquiry was. I informed the judge of my intent to object thereto, on the record, I then did object thereto, although the Court Reporter did not note my objection for the record." (Appellant's brief, p. 43.)
In the affidavit made by counsel, Grant A. Paris, he states:
 "In Volume 5, at Page R961, of said transcript, it indicates that I was present and answered, 'Satisfied, Your Honor,' when in fact I was not present in the Courtroom at that time and never so answered." (Appellant's brief, p. 45.)
This court cannot consider the appellant's motion to extend the record on appeal and the accompanying affidavits as part of the record merely because they are attached to the appellant's brief. See Edwards v. State, 287 Ala. 588, 253 So.2d 513
(1971); Dunaway v. State, 50 Ala. App. 198, 278 So.2d 198, cert. denied, 291 Ala. 777, 278 So.2d 200 (1973); Anderson v. State,455 So.2d 957 (Ala.Cr.App.), cert. denied, 455 So.2d 957
(Ala. 1984).
The appellant has failed to make a proper motion to supplement the record under Rule 10(f), A.R.A.P. Thus, the validity of the affidavits attached to the appellant's brief cannot be considered on appeal. Turner v. State, 380 So.2d 393
(Ala.Cr.App. 1980); Callens v. State, 471 So.2d 482
(Ala.Cr.App. 1984), cert. denied, 471 So.2d 482 (Ala. 1985);Edwards, supra.
In Vaughn v. Britton, 740 F.2d 833 (11th Cir. 1984), cert. denied, 469 U.S. 1163, *Page 1259 105 S.Ct. 920, 83 L.Ed.2d 932 (1985), defense counsel stated in the defendant's brief to this court that he had objected to the trial court's Allen charge to the jury, but that his objection was not noted in the record. The Eleventh Circuit held that this was insufficient, under Alabama law, to comply with the duty to file a correct record on appeal and that this procedural default precluded review of the merits of the issue.
When a defendant fails to file a proper 10(f) A.R.A.P. motion and the record demonstrates the trial proceedings are regular on its face, this court can only conclude that the record on appeal is correct. Hollins v. State, 415 So.2d 1249
(Ala.Cr.App. 1982).
Thus, this issue has not been preserved for our review.
Furthermore, we do not find the trial judge's refusal to give additional instructions to the jury on murder and capital murder to be error, since the trial judge thoroughly instructed the jury on these matters in his oral charge to them. There is no basis of error to reversal shown here.
 IV
Section 13A-5-53, Code of Alabama (1981), requires this court to review the propriety of the appellant's death sentence and to examine the record for any errors affecting this conviction.
This court has reviewed the entire record in this cause as required by § 13A-5-53(a), Code of Alabama (1975), and we have found no error adversely affecting the rights of this appellant. Beck v. State, 396 So.2d 645 (Ala. 1980). See also rule 45A, A.R.A.P.
The trial court found the existence of two aggravating circumstances: "The capital offense was committed while this defendant was engaged in the commission of, or flight after committing or attempting to commit Robbery and Kidnapping," (§ 13A-5-49(4)), and, that, "The Capital offenses were especially heinous, atrocious or cruel when compared to other capital offenses." (§ 13A-5-49(8).) (P.C. 200.)
The first aggravating circumstance is fully supported by the record, supra. Further, we are convinced that these capital offenses were especially heinous, atrocious, and cruel.Hubbard v. State, 500 So.2d 1204 (Ala.Cr.App. 1986), affirmed,500 So.2d 1231 (Ala. 1986), cert. denied, Hubbard v. Alabama,480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987). The appellant planned to obtain some money from these victims and went to their home to carry out his plan. He told the victims that Mrs. Blackmon's daughter was being held hostage and obtained $5,000 from the Blackmons based on this story. He then kidnapped both victims and gagged and bound them. He took Mrs. Blackmon to a secluded spot and hit her with such force that same broke her nose. Then the appellant shot her three times and left her. He returned the next day, mutilated her body and then put her in a "weighted barrel" and pushed it in the Coosa River. Mr. Blackmon was shot and killed after he begged for his life and offered the appellant $50,000 to spare his life. His body was placed in his automobile's trunk and driven into the Coosa River. These facts certainly sustain and support the trial judge's finding of the second aggravating circumstance. See Thompson v. State, 503 So.2d 871 (Ala.Cr.App. 1986), affirmed, 503 So.2d 887 (Ala. 1986), cert. denied, Thompson v.Alabama, ___ U.S. ___, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).
The trial judge found one statutory mitigating circumstance. "The defendant was twenty (20) years of age at the time of the commission of the crime charged." (§ 13A-5-51(7).) (P.C. 202). See Neelley v. State, 494 So.2d 669 (Ala.Cr.App. 1985), aff'd,494 So.2d 697 (Ala. 1986), cert. denied, Neelley v. Alabama,480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (wherein this court found that the same two aggravating circumstances present here outweighed the one statutory mitigating circumstance of age (18 at the time of the offense), and several non-statutory mitigating circumstances).
The trial court also considered the fact that the appellant "to some degree assisted the law enforcement officers in locating the *Page 1260 
bodies of the two victims and the weapons used in the crime," and evidence concerning the appellant's background and character as mitigating circumstances. The trial judge's finding regarding the mitigating circumstances is also supported by the record.
We find no evidence in this record that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Hubbard, supra; Thompson, supra. Our independent weighing of the aggravating and mitigating circumstances convinces us that death was the proper sentence to be imposed in this case. Further, the sentence of death here is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See Beck v.State, 396 So.2d 645, 654, n. 5 (Ala. 1980) (the great majority of death sentences are for robbery (murder); Neelley
(kidnaping/murder) (and cases cited therein). Furthermore, the fact that the appellant's accomplice received a life without parole sentence does not render this appellant's sentence disproportionate. See Neelley and Ex parte Womack,435 So.2d 766 (Ala. 1983,), cert. denied, Womack v. Alabama, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (wherein accomplices had not even been prosecuted for the offense).
We have carefully searched this record for plain error and have found none. Therefore, the appellant's judgment of conviction and sentence of death is proper. The same is due to be, and is hereby, affirmed.*
AFFIRMED.
All the Judges concur.
* The trial judge's findings and sentencing order are set out in an appendix to this opinion. *Page 1261 
 APPENDIX
[EDITORS' NOTE: The Handwritten part IS ELECTRONICALLY NON-TRANSFERRABLE.]
 FINDINGS OF FACT BY THE COURT FROM THE EVIDENCE AND TESTIMONY PRESENTED DURING THE GUILT PHASE OF THE TRIAL
After consideration of the evidence and testimony presented before the Court during the guilt phase of the trial in this cause, the Court finds as follows:
On March 26, 1986, Evelyn Holmes Caine Blackmon and Fred Leonard Blackmon resided as husband and wife at 401 Fairway Drive, Anniston, Alabama, Calhoun County. Julie Greenwood, Mrs. Blackmon's daughter by a previous marriage, also lived with them. Julie last saw her mother and Fred Blackmon alive on the morning of March 26, 1986, at their home prior to her (Julie) going to school.
On that same morning William Glen Boyd (a former boyfriend of Julie's) and Robert Denton Milstead drove to a place near the home of Evelyn and Fred Blackmon. They were in Boyd's white 76' Camaro automobile. Boyd told Milstead to go to the house and tell Evelyn that he (Boyd) had arranged for Julie to be kidnaped, that he was on a rampage, that he wanted to talk to her, and that when she let him in, he (Milstead) was to leave the back door unlocked so he (Boyd) could slip in. After Milstead got inside the home, Boyd did slip in the back door, armed with a pistol. After some conversation and threats, Boyd tied up Evelyn and told Milstead, who was also armed, to watch her. Boyd then forced Fred to go with him. *Page 1262 
Later that morning, at 9:15 a. m., Linda Jenkins, an operations officer at 1st Alabama Bank of Anniston approved and cashed a $5000.00 check for Fred Blackmon at a drive in window at the bank. She testified that a white, slender male with long, dark hair was in the car with Mr. Blackmon. In a short while Boyd and Fred Blackmon returned to the house. Boyd had a large amount of money and took $1500.00 from Fred's billfold. Boyd also took a necklace of Evelyn's and ripped two phones from the wall. Boyd and Milstead then forced Evelyn and Fred to leave with, them in a 1985 Cadillac belonging to Fred. The auto was an Eldorado Barritz with VIN# 1G6EL578FE667616 Alabama License tag number 11-P-2864.
The Court further finds, from the evidence and testimony, that Boyd and Milstead took the victims in Fred's car to an area on the west side of the Coosa River where Boyd took Evelyn into a thicket where he gagged her, and while she was bound and gagged, he attempted to knock her out by hitting her in the face and on the head with a large limb. Having failed to knock her out — even though her face was crushed — he pulled out a pistol and shot her in the neck and head. She continued to struggle and Boyd shot her again in the back.
The third shot killed her and Boyd threw some limbs on her and left. *Page 1263 
Boyd and Milstead then drove Fred Blackmon back across the river into Calhoun County to another remote area and Boyd took Fred into the woods while Milstead remained near the car a short distance away. Boyd tried to knock out Fred by hitting him in the head with a long stick. When he failed to knock him out he told Milstead, "Get me the gun out of the back seat", whereupon Milstead obliged and while Fred was begging Boyd not to kill him, Boyd said he "had to", and shot Fred Blackmon in the neck causing him to fall and roll toward the water. Boyd drug Fred to the back of the Cadillac and when he saw he was still alive, he shot him in the chest area again. Boyd and Milstead then put Fred's body into the trunk of the Cadillac, drove back to near the Fairway residence of the Blackmons and retrieved Boyd's car. Later they took the Cadillac — with Fred's body still in the trunk — back to the Ohatchee area and left it in a grocery store parking lot until that evening. That afternoon Milstead purchased two blue 55 gallon drums with a locking top at a salvage store in Bynum, Alabama. Later that night Boyd and Milstead took the Cadillac back to a boat ramp area on the west side of the river and Boyd let the car windows down, put the car in gear, turned off the lights, and ran it out into the river approximately 30 feet from shore where it sank below the surface. Boyd then wanted to dispose of Evelyn's body that night, but Milstead was too scared to go into the woods. *Page 1264 
They threw the guns used to kill the Blackmons into a creek off a bridge. They were later recovered and identified.
The next morning Boyd and Milstead returned to where Evelyn's body had been left. Boyd kicked Evelyn and seeing that she was stiff, got an axe from the truck and attempted to chop her body at the lower back area so that it would go in one of the drums. Having failed to chop her in two, Boyd then pulled her legs backward toward her head until her backbone broke. Boyd said (according to Milstead, and the Court so finds) "he had to make her fit into the drum someway". They then put her mutilated body in the blue drum, piled in some rocks to weight it down, sealed the top, and Boyd chopped holes in the drum to let in water; then they threw the drum into the river a short distance (approximately 12 feet) from the shoreline of the river. *Page 1265 
Lt. Carroll of the Anniston Police Department testified he talked with Boyd on two (2) oocasions: April 3, 1986, and April 11, 1986. The Court finds that the Defendant, William Glen Boyd, while not represented by an attorney, freely, voluntarily and having full knowledge and understanding of his rights, waived his rights to silence and to an attorney and admitted to Lt. Carroll that he and Robert Denton Milstead robbed, abducted the victims (Fred and Evelyn Blackmon) and that he was present when both victims were tied up, gagged, beaten and killed.
The Court further finds that the police, in their investigation, recovered from the crime scenes two (2) spent shells of the same caliber as the murder weapons, some hair identified by John Case, a criminalist, as being the same as Evelyn Blackmon's, broken red glass later matched to Fred's Cadillac, some pieces of cloth and string that were the same kind of cloth as the clothes on Evelyn's body when it was recovered, hair from the trunk of the Cadillac was identified as Fred's. These items of evidence tended to connect the Defendant to the crimes.
Dr. Embry, toxicologist, testified that the cause of death of Evelyn Blackmon was multiple gun shot wounds.
Dr. Schurman, toxicologist, testified that the cause of death of Fred Blackmon was gun shots to the chest and neck.
Kenny Surrett testified, and the Court so finds, that Boyd called him to come to his house because he wanted to tell *Page 1266 
him something. When Surrett got to Boyd's house, he saw a lot of money on a table. Boyd told him that he got it from Fred Blackmon, and that he (Boyd) did not realize how cold-blooded he was. He admitted killing Fred and said that Milstead killed Evelyn; however, the Jury convicted Boyd of killing both victims and the Court so finds.
The Court having considered all the testimony and all the evidence, both for the State and the Defendant, William Glen Boyd, finds that William Glen Boyd, actively participated in the robbery and kidnaping of Fred and Evelyn Blackmon, and that during, or in the course of said robbery and kidnaping, that the Blackmons were shot, beaten and killed, (hair and fiber evidence, together with a necklace identified as Evelyn's found in the Defendant Boyd's car, a white Camaro, at the time of his arrest support this.)
The Court further finds that the Defendant, Boyd, attempted to hide, and ultimately destroy the bodies of the deceased, together with the vehicle of Fred Blackmon and the guns (pistols) used to kill the victims. *Page 1267 
 FINDINGS CONCERNING THE EXISTENCE OR NON EXISTENCE OF AGGRAVATING CIRCUMSTANCES
In accordance with mandate of Sections 13A-5-45 and 13A-5-47Code of Alabama, 1975 (as amended), the Court makes the following findings in regard to the aggravating circumstances set out by Section 13A-5-49 Code of Alabama, 1975 (as amended). The Court finds as follows:
 (1) That the Capital offense was not committed by a person under sentence of imprisonment.
 (2) That the Defendant had not been previously convicted of another Capital felony, and had not been previously convicted of a felony involving the use of threat of violence to another person.
 (3) The acts allegedly committed by the Defendant in the instant case were not ones that created a great risk of death to many persons.
 (4) The Capital offense was committed while the Defendant was engaged in the commission of, or flight after committing or attempting to commit Robbery and Kidnaping.
 (5) The Capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
(6) The Capital offense was not committed for pecuniary gain.
 (7) The Capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
 (8) The Capital offenses were especially henious, atrocious, or cruel when compared to other Capital offenses. The Court reaches the conclusion that this aggravating circumstance exists based upon the interpretation of the aggravating circumstances as made by the Alabama Court of Criminal Appeals and the Supreme Court of Alabama in defining heinous, atrocious or cruel, and evidence of the following: *Page 1268 
 (a) That Defendant invaded the privacy of the victims, threatened to kill their daughter (and stepdaughter), robbed them, kidnaped them at gun point from their home, bound and gagged them, took them to a remote area and abused both of them while they were fighting and begging for their lives.
 (b) The Defendant inflicted severe pain and suffering upon both victims by hitting them on the head and in the face with a large limb while they were tied up and blindfolded.
 (c) The Defendant shot each victim two or three times after physically abusing them.
 (d) The Defendant used an ax to cut Evelyn Blackmon so that her body would go into a 55 gallon drum.
 (e) The Defendant bragged about the killings and about how cold blooded he was.
By any standard acceptable to a civilized society, these crimes were extremely wicked and shockingly evil. They were purpetrated with a design to inflict a high degree of pain with utter indifference to the suffering of the victims. The Court recognizes that all Capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness and cruelty in these offenses far exceeds that which is common to all Capital offenses. No other aggravating circumstances are found by the Court to exist in this case. The Court makes the following findings under Sections 13A-5-50 and 13A-5-51Code of Alabama, 1975 (as amended) in regard to mitigating circumstances. The Court finds that:
 (1) The Defendant has a significant history of prior criminal activity, as shown by the pre-sentence report introduced into evidence with no objection from the Defendant. *Page 1269 
 (2) The Defendant was not under the influence of extreme mental or emotional disturbances during the commission of the Capital offenses charged in this case.
 (3) The victim was not a participant in the Defendant's conduct.
 (4) The Defendant was not merely an accomplice in the Capital offenses committed by another person, further the Defendant's participation was not relatively minor.
 (5) The Defendant did not act under extreme duress or under the substantial domination of another person.
 (6) The Defendant did have the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.
 (7) The Defendant was twenty (20) years of age at the time of the commission of the crime charged.
The Court further finds that the Defendant, William Glen Boyd, to some degree assisted the law enforcement officers in locating the bodies of the victims and the weapons used in the crime. The Court has considered this as a non-statutory mitigating circumstances.
In addition to the above, the Court has considered the evidence and testimony presented to the jury and to the Court in regard to the Defendant's background and character as the same pertains to the mitigating circumstances that should be properly considered by the Court.
The Court finds that the jury in this case was not emotionally influenced with passion, prejudice or other arbitrary factors in arriving at its findings of guilty as to the Capital offenses. As to the recommendation of punishment of life without parole, the Defendant, his sister and his mother made highly emotional pleas against the death penalty, the State presented no testimony in the sentence recommendation hearing. *Page 1270 
The Court further finds that if the jury was emotionally influenced with passion as a result of this testimony, it was all in favor of the Defendant as was evident from the jury's advisory verdict of life without parole.
After due consideration of all the matters that were presented to the Court during this hearing, both in mitigation and aggravation, the Court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case, and has given consideration to the recommendation of the jury contained in its advisory verdict, and has taken into consideration all other matters that are properly before the Court, including the pre-sentence report and the arguments of the State and the Defendant. While the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the Court's consideration, this Court does now find, and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances of this horrible, cold blooded crime as shown and brought before the Court far outweigh the mitigating circumstances shown to the Court, and that said aggravating circumstances outweigh the said mitigating circumstances in all regards and that they are sufficient in both quantity and quality to more than uphold a sentence of DEATH in this case. *Page 1271 
STATE OF ALABAMA, * IN THE CIRCUIT COURT OF *
PLAINTIFF, * CALHOUN COUNTY, ALABAMA *
VS. * *
WILLIAM GLEN BOYD, * CASE NO. CC-86-454 *
DEFENDANT. *
 ORDER OF THE COURT ON IMPOSITION OF SENTENCE
The Defendant in the above-styled case, William Glen Boyd, was charged by Indictment returned by the Grand Jury of Calhoun County, Alabama, during its April, 1986, session, with eight (8) counts of Capital Murder as codified in Section 13-5-40Code of Alabama, 1975 (as amended). More specifically, the Defendant, William Glen Boyd, was charged with the following Capital Offenses:
 Two counts of Murder during a Kidnaping in the First Degree of Evelyn Blackmon;
 Two counts of Murder during a Kidnaping in the First degree of Fred Blackmon;
 Two counts of Murder of Evelyn Blackmon during a Robbery in the First Degree;
 Two counts of Murder of Fred Blackmon during a Robbery in the First Degree.
This case came on to be heard before the Court and a Jury of five women and seven men (and two alternate Jurors who were discharged according to law) duly impaneled and sworn as required by law; whereupon the principal jurors after hearing the evidence, the Court's charge as to the applicable law, *Page 1272 
including the lesser included offenses of Murder, Kidnaping in the First Degree, Robbery in the First Degree and upon consideration of the law and the evidence, found the Defendant guilty of the Capital Offenses of Murder by the Defendant of Evelyn Blackmon during a Kidnaping in the First Degree or attempt thereof as charged in Counts I and III of the Indictment, guilty of the Capital Offense of Murder by the Defendant of Fred Blackmon during a Kidnaping in the First Degree or attempt thereof as charged in Counts II and IV of the Indictment, guilty of the Capital Offense of Murder by the Defendant of Evelyn Blackmon during a Robbery in the First Degree as charged in Counts V and VII of the Indictment, and guilty of the Capital Offenses of Murder by the Defendant of Fred Blackmon during a Robbery in the First Degree as charged in Counts VI and VIII of the Indictment. The Jury, upon request of the Defendant, was polled as to its Verdict and the Verdict was determined to be unanimous.
The Court announced the Jury Verdict on March 20, 1987, and the Court then, in accord with the Jury Verdict adjudged the Defendant, William Glen Boyd, guilty of eight (8) counts of Capital Murder as charged in Counts I, II, III, IV, V, VI, VII, VIII of the Indictment.
The Court commenced a punishment phase hearing before the same Jury as required by Section 13A-5-46, Code of Alabama, 1975 (as amended). After hearing evidence during the punishment phase the Jury was again charged as to the applicable law *Page 1273 
advising said jury if the mitigating circumstances outweighed the aggravating circumstances proven by the State beyond a reasonable doubt, then punishment would be life imprisonment without eligibility for parole, but if the aggravating circumstances proven by the State beyond a reasonable doubt outweighed the mitigating circumstances as shown by the Court's charge, than the verdict should be death. The jury was further charged that they must avoid any influence from passion, prejudice or sympathy to enter into their verdict one way or the other. Both the State and the Defendant's attorneys advised the Court they were satisfied with the Court's charge to the jury.
After due deliberation, the Jury returned a Verdict fixing the Defendant's punishment at life without parole. The body of the Verdict stated that the vote was five votes in favor of Death and seven for life without parole in accordance with Section 13A-5-46(f), Code of Alabama, 1975 (as amended).
After the jury verdict was returned and read in open court, the Court set a formal hearing for April 9, 1987, at 9:00 a.m. At said hearing the Defendant, his attorneys, Grant Paris, Stephen Levinson, and Mannon Bankson were present. Robert Field was present for the State.
The Court has ordered and received a written pre-sentence investigation report and has conducted an additional sentence hearing pursuant to Section 13A-5-47, Code of Alabama, (Recomp. 1975). At the sentence hearing, the State, through its District *Page 1274 
Attorney offered the pre-sentence report into evidence, and the Court considered same, and urged that the Court fix the Defendant's punishment at death. The Defendant, through his counsel, argued that the Court should fix his punishment, in accordance with the jury's recommendation, at life in prison without parole. *Page 1275 
ACCORDINGLY, IT IS ORDERED ADJUDGE, AND DECREED that the Defendant, William Glen Boyd, shall be punished by death by electrocution.
This the 29th day of April, 1987.
 ______________________ HAROLD G. QUATTLEBAUM Circuit Judge
[EDITORS' NOTE: The Handwritten part IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1276