[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 901 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 902 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 903 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 904 
The appellant, John Michael Ward, was convicted of the capital murder of a child less than 14 years of age, a violation of § 13A-5-40(15), Ala. Code 1975. The jury, by a vote of 10-2, recommended that Ward be sentenced to death. The trial court imposed the death sentence recommended by the jury.
The record contains a summary of the facts and evidence presented, as rendered by the trial court. In pertinent part, the trial court's order states as follows:
 "On April 22, 1997, at 7:28 A.M. an operator at the Baldwin County 911 Center received a call from Michelle Milner Ward, who stated that her baby was not breathing. Ten minutes later paramedics arrived at the Wards residence, a 16' x 7' travel trailer. After receiving Nicholas Ward's body from John Michael Ward (hereinafter `Ward') the paramedics attempted resuscitation by intubation while en route to the South Baldwin Regional Medical Center. The emergency room attending physician, Dr. Robert Revel, examined the infant determining that he was not breathing, had no pulse, was cold to the touch and had rigor mortis. The doctor pronounced the child dead on arrival. In addition to the lack of vital signs, Dr. Revel observed abrasions on Nicholas's scalp, nose and mouth area, pus-like material in his eyes, blood in the ears, bruises on the neck and chest, stool in the diaper, a deformity on his right arm, and crusty material in some nail beds.
 "After the examination, Dr. Revel interviewed both parents. The father stated that Nicholas had been struck on the head by a folding chair falling from a shelf and that the baby had had breathing problems later in the day. The mother had wanted to seek medical attention, but that the father did not think it necessary.
 "Dr. Harold Reed, a pediatrician, answered the code call in the emergency room. He testified that he also examined the body and found the internal body temperature was 88 degrees.
 "Because foul play was suspected, hospital personnel contacted the Baldwin County Sheriff's office. Officer John Stewart arrived first and was followed by Chief Investigator Huey Mack, Jr. Officer Mack also observed abrasions on Nicholas's forehead, nose and mouth, bruises on the chest and arm, and missing toenails. He notified the Baldwin County coroner and the Department of Forensic Science of the unnatural death. Mr. Mack testified that the mother appeared to be upset during the administration of the last rites, but Ward was emotionless.
 "Investigator Mack left the hospital and met Chuck Machette, a caseworker with the Baldwin County Department of Human Resources at the Ward residence. The crime scene was photographed and videotaped. Ward and his wife participated in the taping. Mack took into his possession a blood-stained pillow from the bed where the parents said Nicholas had been sleeping the night before. Subsequent DNA testing revealed the blood belonged to Nicholas.
 "Dr. James Downs, the state medical examiner, performed the autopsy on Nicholas. He photographed and videotaped the body during the course of the autopsy. The pictures recorded the various injuries to the baby's body. From *Page 905 
 the autopsy procedure, Dr. Downs concluded that Nicholas had been an infant that failed to thrive. In addition, the child suffered multiple fractures to the arms and ribs and damage to the toenails and fingernails. He opined that Nicholas suffered a spiral fracture of the right arm the day before death. Dr. Downs determined the cause of death to be multiple blunt force injuries and suffocation.
 "Michelle Milner Ward testified that early in her relationship with Ward he placed his hand over her mouth and threatened to suffocate her. Ward continued to physically abuse his wife throughout the marriage.
 "Nicholas was born in December 1996, as the second child of her marriage to Ward. In January 1997, Mrs. Ward fled to her mother's home in Mobile, taking Nicholas and his sister, April. After remaining there one month, Mrs. Ward and the children moved to Penelope House, a Mobile County Shelter for battered women. After one month there, the mother and children returned to Ward's trailer in Magnolia Springs. Ward inflicted numerous injuries on his four-month-old son and murdered him by suffocation in the early morning hour of April 22, 1997."
(C. 5-7.)
Ward raises several issues on appeal, many of which were not presented to the trial court. Ward, however, was sentenced to death; therefore, the failure to raise these issues at trial does not prevent our review. It does weigh against any claim of prejudice Ward now makes on appeal. See Burgess v. State, 723 So.2d 770 (Ala.Cr.App. 1998); Kuenzel v.State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). "`[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641,645 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied,514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting UnitedStates v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1
(1985) (quoting, in turn, United States v. Frady, 456 U.S. 152, 163,102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
Accordingly, we will now address the issues Ward raises for our review.
 I.
Ward contends that the trial court erred in admitting slides of photographs and a videotape depicting images of the autopsy. Specifically, he argues that the photographs and videotape were inflammatory, irrelevant, and highly prejudicial. Additionally, he claims that the prosecution intentionally appealed to the jurors' emotions by showing the videotape of the external and internal injuries of the body.
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 *Page 906 
 [(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)]."
Pilley v. State, 980 So.2d 870, 882 (Ala.Cr.App. 1998), rev'd on other grounds, 789 So.2d 888 (Ala. 2000).
In Siebert v. State, 562 So.2d 586 (Ala.Cr.App. 1989), this Court stated:
 "The same rule applies for videotapes as for photographs: `The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Ex parte Carpenter, 400 So.2d 427 (Ala. 1981).' Walker v. State, 416 So.2d 1083, 1090
(Ala.Cr.App. 1982). See also White v. State, 435 So.2d 1367, 1371 (Ala.Cr.App. 1983).
 "`These photographs did have "some tendency to prove or disprove some disputed or material issue" or "to illustrate or elucidate some other relevant fact or evidence, or corroborate or disprove some other evidence offered or to be offered." Baldwin v. State, 282 Ala. 653, 655, 213 So.2d 819, 820
(1968). There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk "comes with the territory."'
"Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App. 1988).
 "`Further, the receipt into evidence of such exhibits lies within the sound discretion of the trial court. Hopkins v. State, 429 So.2d 1146 (Ala.Cr.App. 1983).' Burton v. State, 521 So.2d 91, 92 (Ala.Cr.App. 1987)."
562 So.2d at 599.
Additionally, in Gentry v. State, 689 So.2d 894, 907 (Ala.Cr.App. 1994), this Court stated:
 "`It has long been the law in Alabama that "[p]hotographs which show the external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried. Burton v. State, 521 So.2d 91
(Ala.Cr.App. 1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App. 1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985). See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App. 1984); Jones v. State, 439 So.2d 776, (Ala.Cr.App. 1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982).'"
Gentry v. State, supra, quoting Bankhead v. State, 585 So.2d 97
(Ala.Cr.App. 1989). "`This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896
(Ala.Cr.App. 1983).'" Gentry, supra, quoting Bankhead. "There is no reason to treat photographs of internal wounds differently than photographs of external wounds." Hammock v. State, 612 So.2d 545, 547
(Ala.Cr.App. 1992).
During the testimony of Dr. James Downs, a state medical examiner, a videotape depicting images of the external and internal injuries to the body during the autopsy was shown to the jury.[1] During the playing of the videotape to the jury, Dr. Downs identified the various injuries *Page 907 
on the body and explained which injuries were inflicted within days and which injuries were inflicted within weeks of Nicholas's death. Dr. Downs testified that there were seven older fractures and one newer fracture to the ribcage. During Dr. Downs's testimony, photographs and videotaped footage of the ribcage, which had been removed from the body, were shown to the jury.[2] The record indicates that only portions of the videotape were played to the jury, and that the jury was not shown any images not related to the injuries that caused Nicholas's death. Dr. Downs testified that Nicholas died from multiple blunt force injuries and suffocation, and that Nicholas was a victim of "battered child syndrome."
The series of videotaped images of the body during the autopsy were necessary to identify the numerous injuries to the body, to distinguish the older injuries from the newer injuries, and to establish the cause of death. Additionally, the videotaped footage and Dr. Downs's testimony revealed that Nicholas received multiple injuries over an extended period of time, and supported Dr. Downs's theory that Nicholas was a victim of battered child syndrome. Thus, the footage from the videotape was relevant, and the prejudicial impact was substantially outweighed by its probative value. The trial court did not err in permitting the state to show videotaped images of the body taken during the autopsy.
Ward further contends that the trial court erred in admitting into evidence photographic slides of the body shortly after arriving at the hospital.
Because defense counsel did not object to the admissibility of the photographic slides at trial, we will address only whether their introduction into evidence was plain error. Rule 45A, Ala.R.App.P.
In his brief to this Court, Ward concedes that the photographic slides were admissible to prove the cause of Nicholas's death. Our review of the record indicates that the slides depicted various external injuries and indicated the victim's condition upon arrival to the hospital. Thus, the prejudicial impact of the photographic slides was substantially outweighed by the probative value. We conclude that the trial court did not err in admitting the photographs into evidence.
 II.
Ward maintains that the trial court should have compelled the state to elect a specific incident of abuse in order to convict him of capital murder. Additionally, Ward appears to argue that the state should have elected whether to proceed on the basis that Nicholas's death was the result of blunt force injuries or of suffocation.
In R.L.G., Jr. v. State, 712 So.2d 348 (Ala.Cr.App. 1997), this Court stated:
 "`"`The need for election arises where there is but one count charging a single offense, but the proof shows more than one instance of that offense. The cases of Deason v. State, 363 So.2d 1001
(Ala. 1978), and Reed v. State, 512 So.2d 804
(Ala.Cr.App. 1987), stand for the proposition that when the State has charged the accused with one offense in one count of the indictment, but has presented evidence that the accused committed that offense several times on several different dates, the State, upon proper motion, is required to elect the *Page 908 
date of the offense on which it seeks a conviction.'
 "`"J.D.S. v. State, 587 So.2d 1249, 1256
(Ala.Cr.App. 1991)."
 "`Sparrow v. State, 606 So.2d 219, 220-221 (Ala.Cr.App. 1992).'"
712 So.2d at 355.
In this case, Ward was found guilty of Count I as charged in the indictment, which stated:
 "The Grand Jury of said County charge that before finding this indictment on to-wit: John Michael Ward whose name is otherwise unknown to the Grand Jury other than as stated, did, intentionally cause the death of Nicholas Ward, a child less than 14 years of age having been born on or about December 6, 1996, by inflicting multiple blunt force injuries and/or causing directly or indirectly suffocation of the child, in violation of Alabama Code § 13A-5-40(15). . . ."
Given that Ward was charged with capital murder, and not child abuse, there was no need for the prosecution to elect a specific incident in which Ward inflicted blunt-force injuries or other types of child abuse onto Nicholas. Furthermore, Dr. Downs testified that the official cause of death was multiple blunt-force injuries and suffocation. Dr. Downs additionally testified, because Nicholas suffered from battered child syndrome, he received numerous injuries over a prolonged period of time, which also contributed to his death. Because there was only one instance of the offense of murder, the trial court did not err in denying Ward's request to compel the state to elect between incidents of abuse.
 III.
Ward contends that the state failed to establish a prima facie case of capital murder of a child less than 14 years of age. Specifically, he argues that there was no evidence of a "particularized intent to kill." (Appellant's brief at 4.)
 "`"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." *Page 909 
 "`Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979), citing United States v. Black, 497 F.2d 1039 (5th Cir. 1974). Additionally, circumstantial evidence may form the proof of the corpus delicti; if facts are presented from which a jury may draw a reasonable inference that a crime has been committed, the case must be submitted to the jury. Breeding v. State, 523 So.2d 496, 500 (Ala.Cr.App. 1987).'
 "MacEwan v. State, 701 So.2d 66, 70-71 (Ala.Cr.App. 1997).
 "`"A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. In reviewing a conviction based on circumstantial evidence, `the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable [hypothesis] except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.'"
 "`McMillian [v. State], 594 So.2d [1253] at 1263
[(Ala.Cr.App. 1991)] (citations omitted). See also Potts v. State, 426 So.2d 886 (Ala.Cr.App. 1982), aff'd, 426 So.2d 896 (Ala. 1983). This statement of the law refers to cases in which the evidence is entirely circumstantial.
 "`"`The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.'"
 "`White v. State, 546 So.2d 1014, 1022-23
(Ala.Cr.App. 1989), quoting Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969).'
 "Jenkins v. State, 627 So.2d 1034, 1040 (Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). Furthermore, the question of a defendant's intent at the time of the commission of a crime is usually a question for the jury. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983).
 "`In Jones v. State, 591 So.2d 569, 574
(Ala.Cr.App. 1991), this court stated:
 "`"`[T]he element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' Johnson v. State, 390 So.2d 1160, 1167
(Ala.Cr.App.), cert. denied, 390 So.2d 1168
(Ala. 1980). Accord, Fears v. State, 451 So.2d 385, 387 (Ala.Cr.App. 1984); Young v. State, 428 So.2d 155, 158 (Ala.Cr.App. 1982)."
 "`Additionally, in Bishop v. State, 482 So.2d 1322, 1326 (Ala.Cr.App. 1985), this court held:
 "`"`Intent may be presumed from the act of using a deadly weapon. McArdle v. State, 372 So.2d 897
(Ala.Crim.App.), cert. denied, 372 So.2d 902
(Ala. 1979), and from the character of the assault, including the nature and amount of force used in the fatal injury. Flint v. State, 370 So.2d 332 (Ala.Crim.App. 1979).'
 "`"Chaney v. State, 417 So.2d 625, 627
(Ala.Crim.App. 1982). . . . In Underhill on Criminal Evidence, § 540 (3d ed. 1923), we find the following statement regarding proof of intent in an attempted murder charge:
 "`"`Thus, as a general rule, the force or violence which was employed must be proven to have been intentional. . . . The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another.'"'
"Long v. State, 668 So.2d 56, 60 (Ala.Cr.App. 1995)." *Page 910 
Davis v. State, 740 So.2d 1115, 1119-20 (Ala.Cr.App. 1998). See alsoMinor v. State, 780 So.2d 707 (Ala.Cr.App. 1999); and Hughley v. State,574 So.2d 991 (Ala.Cr.App. 1990) (sufficient circumstantial evidence was presented by the state through testimony of the pediatrician who examined the defendant's eight-month old son, describing injuries and testifying that the injuries were caused by shaken infant syndrome to support defendant's conviction of intentional murder of son).
The state's evidence tended to establish the following. Rashay Keith, an emergency 911 operator, testified that at 7:28 a.m. on April 22, 1997, Michelle Milner, Nicholas's mother, telephoned and told him that her son was not breathing. Keith dispatched an ambulance to the scene. Porsha McMahan, a paramedic, testified that the ambulance arrived at Ward's travel trailer at 7:41 a.m. and that Milner was crying. Allen Hayes, a paramedic, testified that Ward handed Nicholas to him and that Ward did not show any emotion. Hayes further stated that Nicholas appeared to have been dead for several hours.
Robert Revel, an emergency room physician, testified that Nicholas arrived at the hospital at 7:52 a.m. on April 22, 1997. Revel stated that Nicholas had no pulse, had rigor mortis and "rubor mortis", and that he believed Nicholas was dead upon arrival at the hospital. According to Revel, Nicholas had sustained several injuries before his death, including abrasions on the scalp, nose, mouth, and jawline, bruises to the neck, the front of the chest, and the jawline, a spiral fracture to the right arm, and the traumatic removal of two toenails. Revel further testified that there was dried blood in the ear canals, and the pupils of his eyes contained pus. Additionally, Revel testified that the body temperature was 88 degrees, indicating that Nicholas had been dead for several hours.
Dr. James Downs, a state medical examiner, testified that he conducted an autopsy on the body at 2:00 p.m. on April 22, 1997. Dr. Downs stated that Nicholas had sustained several internal and external injuries, including a tear and bruise inside the mouth and a circular scab, consistent with a cigarette burn, on a toe. Additionally, he testified that Nicholas has suffered a spiral fracture to the right arm, which occurred approximately two days before his death; a fracture to the left arm, which occurred approximately three weeks before his death, seven rib fractures, which occurred approximately four to eight weeks before his death; and one rib fracture, which occurred within a few days before his death. Dr. Downs stated that the injuries to the lips occurred within a few hours before death. According to Dr. Downs, blood in the child's eyeballs indicated that he had been severely shaken approximately one month before death. Dr. Downs testified that, in his opinion, Nicholas was a victim of battered child syndrome, and Nicholas died from both blunt-force injuries and suffocation. Dr. Downs further stated that, in his opinion, the suffocation occurred from something, such as a pillow, being held over Nicholas's face.[3]
Huey Mack, Jr., the chief investigator for the Baldwin County Sheriff's Office and formerly a forensic investigator and coroner, testified that he examined Nicholas at the hospital, and that, in his opinion, Nicholas had died approximately six to eight hours before his arrival at the hospital. *Page 911 
Michelle Milner testified that Nicholas was born in December 1996. Milner stated that, one month after Nicholas's birth, Ward pushed vitamin pills down Nicholas's throat and bent his legs in an unnatural position. According to Milner, she believed that Ward's behavior was unhealthy for the baby, and after living with Ward for a few weeks, she, Nicholas, and her two-year old daughter moved out of Ward's travel trailer and into her mother's house. Milner testified that, after staying at her mother's for one month, she moved into a shelter for battered women and children. Claire Geary, an employee of the shelter, testified that Milner arrived at the shelter on January 29, 1997, and that she left on February 25, 1997. Geary stated that Nicholas was not injured during his stay at the shelter. Milner testified that, after she moved out of the shelter, she and the children returned to Ward's travel trailer.
Milner further testified that, around 6:30 a.m. on April 21, she and Ward argued. Milner stated that Ward punched her in the arm and that, although she normally did not retaliate against Ward, she threw a bottle of lotion at him. According to Milner, during the argument, Nicholas was asleep on the bed. Milner stated that Ward became angry and threw her daughter's portable training potty at her head. Milner testified that she told Ward she was going to telephone the police and ran outside. Milner stated that Ward locked her out of their trailer and that her daughter and Nicholas remained inside with Ward. According to Milner, she banged on the door for approximately 15 minutes and asked him to let her back in. Milner testified that she walked to Ward's truck and grabbed his keys, and that, as she walked toward the trailer, Ward calmly opened the door and permitted her to go inside. Milner stated that Nicholas was lying on the bed, asleep.
Milner further testified that, later that morning, she left Nicholas with Ward and ran errands with her daughter. Milner stated that when she returned approximately 30 minutes later, Nicholas was breathing irregularly and white foam was coming out of his mouth and nose. Milner stated that she asked Ward what had happened to Nicholas. According to Milner, Ward told her that when he had walked into the trailer the night before, he saw Nicholas stuck between the recliner and their bed, and then he saw Nicholas fall onto the floor. Milner testified that she told Ward that she believed that they should take Nicholas to the hospital, and that Ward told her that babies are agile and that he did not believe that Nicholas needed medical assistance. Milner stated that, later that day, she attempted to feed Nicholas, but that he would not eat. Milner stated that she went to sleep with Nicholas next to her and that around 3:00 a.m. on April 22, she awakened, noticed that Nicholas was not breathing, and went back to sleep. Milner further stated that, around 7:00 a.m., she awakened, realized that Nicholas was not breathing, and telephoned for help.
Huey Mack, Jr., a Baldwin County investigator, testified that he went to the trailer on April 22, and that he removed a stained pillow from the bed. Elaine Scott, a forensic scientist, testified that the stains on the pillow were from blood and saliva. Faron Brewer, a forensic scientist, testified that he conducted a DNA analysis on the blood and saliva found on the pillow, and that, in his opinion, the blood and saliva were Nicholas's.
Viewing the evidence in the light most favorable to the state, we conclude that sufficient evidence was presented to sustain Ward's conviction for capital murder. Clearly, the circumstances surrounding *Page 912 
Nicholas's death, evidence that a pillow had been used to suffocate the infant, and the extent of Nicholas's injuries were sufficient to support the conclusion that Ward had the specific intent to kill Nicholas. Although there is no direct evidence that Ward intended to murder Nicholas, the evidence supports the conclusion that he intentionally murdered the victim. See Hughley v. State, supra. Accordingly, we find that the state presented sufficient evidence of Ward's guilt and the trial court properly submitted the case to the jury. Ample evidence was presented by the state to support the jury's conclusion and we will not disturb its verdict on the basis that the evidence was insufficient to support it.
 IV.
Ward maintains that the trial court abused its discretion by denying his motion in limine and by admitting evidence of prior abuse against Milner. Specifically, he argues that the evidence of collateral acts was irrelevant and immaterial, and that the prejudicial impact substantially outweighed the probative value of the evidence.
 "`The admissibility of evidence, which has been challenged as irrelevant and remote, is within the sound discretion of the trial judge. A trial judge's decision to admit or exclude such evidence will not be overturned on the appeal absent an abuse of his discretion.' Primm v. State, 473 So.2d 1149, 1157
(Ala.Cr.App. 1985)."
Harvey v. State, 579 So.2d 22, 26 (Ala.Cr.App. 1990).
Rule 404(b), Ala.R.Evid., states, in pertinent part:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
Before the effective date of the Alabama Rules of Evidence, this Court, quoting C. Gamble, McElroy's Alabama Evidence, stated:
 "`This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.
 "`The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible.
 "`In their mental struggles to determine whether evidence of the accused's commission of another crime is admissible, for a purpose other than as tending to show guilt via bad character, the appellate courts in numerous opinions have set forth a list of the various purposes for which evidence of the accused's commission of another crime is admissible. . . .
 "`An interesting question that should be recognized at this point is whether the list of purposes for which prior crimes of the accused can be *Page 913 
 introduced is fixed. The better reasoned view would appear to be that set forth by Mr. Justice McElroy in the second edition: "However, it must not be considered that such a listing of admissible purposes was intended to be exhaustive. It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character."' (Emphasis added [in Nicks], footnotes omitted.)
 "See also Brewer v. State, 440 So.2d 1155
(Ala.Cr.App.), cert. denied, 440 So.2d 1155 (1983); Minnifield v. State, 397 So.2d 189 (Ala.Cr.App.), cert. denied, 397 So.2d 195 (Ala. 1981).
 "Under Alabama law, evidence of any offense other than that specifically charged is prima facie i nadmissible. Allen v. State, 380 So.2d 313
(Ala.Cr.App. 1979), cert. denied, 380 So.2d 341 (Ala. 1980), cert. denied, 449 U.S. 842 (1980). However, Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution's case-in-chief if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, supra. . . .
". . . .
 "`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
 "Underhill, Criminal Evidence § 154 (3d ed. 1923). If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State's case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865
(Ala.Cr.App. 1976); McDonald v. State, 57 Ala. App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834
(1976)."
Nicks v. State, 521 So.2d 1018, 1025-26 (Ala.Cr.App. 1987), aff'd,521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916,101 L.Ed.2d 948 (1988) (emphasis in original). Cf. Biles v. State,715 So.2d 878 (Ala.Cr.App. 1997); and Stewart v. State, 730 So.2d 1203
(Ala.Cr.App. 1996), aff'd, 730 So.2d 1246 (Ala. 1999), cert. denied,528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999).
The facts of this case involve Ward and his relationship with Milner and their four month old son, Nicholas. The evidence clearly indicates that Nicholas was in the *Page 914 
sole custody and control of Milner and Ward in the eight weeks preceding his death. The evidence further indicates that Nicholas was injured shortly after a fight between Milner and Ward. Because Nicholas was only four months old, the evidence concerning the relationship between Milner and Ward and their states of mind with regard to their relationship and attending to the needs of Nicholas was relevant.
Testimony indicated that Ward, Milner, Nicholas, and April, their two-year-old daughter, lived in a 16' x 7' travel trailer in a remote area. Milner testified that Ward preferred to reside away from society, but that he did provide the family with water from a tank above the trailer and with electricity. Milner stated that basic necessities, such as water and electricity, were considered by Ward to be luxuries, and that, because of financial reasons, she and Ward did not always take Nicholas to his doctor's appointments. Additionally, Milner testified that she believed that Ward was more intelligent than herself, and that he had a power of persuasion over her. Milner stated that Ward often criticized her and told her she was stupid. Milner further stated that, throughout her relationship with Ward, Ward was abusive, and she would often leave. However, Milner testified that she believed that each time she returned to Ward that their life together would be better.
Although Milner was not declared a hostile witness, the record indicates her reluctance to testify against Ward. Our review of the record indicates that Milner's testimony concerning Ward's control over the family and his abuse of Nicholas was often evasive and inconsistent. For example, Milner testified that she believed that Ward's behavior of pushing vitamin pills down Nicholas's throat and bending his legs in unnatural positions was abusive. However, Milner also testified that she never saw Ward physically abuse their children. Additionally, Milner stated that, at the time of trial, she was not sure if she believed Ward's explanations concerning Nicholas's injuries. When asked if she loved Ward despite the way he treated Nicholas, Milner stated, "Yes, I love him because God says I don't owe anything but to love him. I'm required by God to love him. And yes, I love him." (R. 922-23.) She further indicated that, if given the opportunity, she would have additional children with him.
Thus, testimony concerning domestic violence in the Ward family was substantially more probative than are random acts of violence by a defendant against various unrelated people. See Ex parte Drinkard,777 So.2d 295 (Ala. 1999).
The state argues that the admission of evidence of Ward's prior physical abuse of Milner was essential to its case because, it says, the evidence explained the inconsistencies in Milner's testimony and established Ward's state of mind at the time of the offense. We will now address the propriety of the admission of evidence of each of the collateral acts.
 A.
Ward argues that Milner should not have been permitted to testify that, during her pregnancy with her daughter and approximately one year before Nicholas's death, Ward slapped and pushed her, jumped on top of her, put his hand over her mouth, and stated, "[y]ou want to breathe, don't you?" (R. 914.)
In Burkett v. State, 439 So.2d 737 (Ala.Cr.App. 1983), this court addressed a similar issue and stated:
 "On his cross-examination of Cecilia Melton, the victim's mother, appellant focused his defense on the theory that Melton caused the injuries giving rise to *Page 915 
 the instant prosecution. Melton's testimony regarding appellant's threats against her and his physical abuse of her was highly competent to illustrate why she did not act to prevent appellant's abuse of the victim and thus it explained her cross-examination testimony and rebutted appellant's theory of defense. We find no error in the admission of the testimony."
439 So.2d at 748.
In this case, Milner testified that she had never seen Ward abuse Nicholas or their daughter. However, Milner also testified that she went to a home for abused women and children because she believed that Ward's behavior of pushing vitamins down Nicholas's throat and stretching him in an inappropriate manner was unhealthy for Nicholas. Milner further testified that she believed that Ward was more intelligent than she was, and that he controlled and influenced her. Therefore, evidence of Ward's prior abuse of Milner during her pregnancy was relevant to prove that Ward's main objective was to control Milner by abusing her and their children and to identify Ward, instead of Milner, as the person who killed Nicholas.
Furthermore, the prior acts were relevant to explain the inconsistencies in Milner's testimony and to explain why she did not act to prevent Ward's abuse of Nicholas. Testimony indicated that despite Milner's knowledge that Ward was abusive, she left the Penelope House and moved back in with Ward. Nicholas's death occurred within eight weeks of her return to Ward's trailer and shortly after a fight occurred between Ward and Milner. Milner testified that although she recognized that Nicholas was seriously injured, she listened to Ward and did not immediately seek assistance. Evidence of Ward's prior physical abuse of Milner was not only probative to show the relationship between these two people and to explain his controlling nature and his tendency to retaliate against Milner by abusing Nicholas but also to explain the state of mind of Milner, a codefendant, at the time of the offense. Such evidence is particularly relevant to explain why Milner might fear Ward, why she might submit to Ward's will without a struggle, or why she might not call for assistance even though she recognized an emergency situation. Thus, evidence that Ward physically abused and threatened Milner during her pregnancy was relevant to explain the relationship between Ward and Milner and to clarify the inconsistencies in Milner's testimony.
 B.
Ward argues that evidence that Milner resided in a home for battered women and children two months before Nicholas's death should not have been admitted.
In this case, Milner testified that she, Nicholas, and her daughter lived with Ward in the travel trailer for a few weeks after Nicholas was born. Milner stated that, because she believed that Ward was abusing Nicholas, she took the children and moved into her mother's house for one month, and then moved into Penelope House, a shelter for abused women and children. Records indicated that she left the shelter on February 25, 1997. Milner testified that she and the children then moved back in the travel trailer with Ward. Testimony indicated that Nicholas died approximately eight weeks after their return. Claire Geary, an employee at the shelter, testified that Nicholas did not receive any injuries during his stay at the shelter. Dr. Downs testified that the rib fractures appeared to have occurred within four to eight weeks of Nicholas's death. The fact that Milner and the children stayed in a shelter two months before *Page 916 
Nicholas's death is relevant to prove that the injuries that caused Nicholas's death occurred after they had left the shelter and returned to Ward's residence. Thus, testimony concerning Milner's stay in the shelter was relevant and probative.
 C.
Ward argues that the trial court erred in permitting Milner to testify that Ward punched her and that he threw a child's portable training potty at her on the day before Nicholas's death.
Milner testified that on April 21, 1997, around 6:30 a.m., she and Ward argued. Milner stated that Ward punched her in the arm and that, although she normally did not retaliate against Ward, she threw a bottle of lotion at him. According to Milner, Ward became angry and threw her daughter's portable training potty at her head. Milner testified that she told Ward she was going to telephone the police and she ran outside. Milner stated that Ward locked her out of the trailer and that her daughter and Nicholas remained inside with Ward. According to Milner, after approximately 15 minutes, Ward opened the door and appeared to be calm.
Given that the argument between Milner and Ward occurred one day before Nicholas's death, that Milner testified that Ward was enraged at Milner for retaliating against him, and that Nicholas was alone with Ward for approximately 15 minutes after their argument, testimony concerning the physical abuse was relevant to prove motive. Additionally, testimony concerning the physical abuse was relevant to prove Ward's state of mind, specifically his need to control Milner. Furthermore, the jury could infer from the particular facts in this case that Ward intended to hurt Milner by killing Nicholas.
Thus, based on the foregoing analysis, evidence of Ward's collateral acts of abuse against Milner had a probative purpose, other than suggesting his bad character; therefore, the trial court did not err in allowing the evidence.
Even though we have concluded that the evidence was relevant, we are ever mindful of the importance of conducting an analysis pursuant to Rule 403, Ala.R.Evid., which states:
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
"The power to make this determination is vested in the trial court. . . . We will not disturb such a determination unless it is clearly an abuse of discretion." Hayes v. State, 717 So.2d 30, 37 (Ala.Cr.App. 1997). Because Milner and Ward were the only two persons responsible for Nicholas, this case centers around their relationship and their actions with regard to Nicholas and his care. We conclude, as did the trial court, that the probative value of the evidence of collateral acts of physical abuse against Milner outweighs its prejudicial effect. Although the evidence was prejudicial, the evidence was limited, it elucidated Milner's testimony, and it placed the circumstances surrounding the offense into context. Moreover, because Milner and Ward were the only two individuals present during the abuse and murder of Nicholas, Milner's testimony was critical to the state's presentation of the evidence. As a reluctant witness, Milner was evasive and inconsistent in her testimony. The admission of Ward's prior abusive acts explained Milner's relationship with Ward, her action in leaving Nicholas in Ward's care just before Nicholas's death, and her *Page 917 
reluctance to testify. Thus, we conclude that the probative value of the evidence outweighed any prejudicial effect; the trial court did not err in admitting the evidence.
 V.
Ward contends that the trial court erred when it qualified two of the state's expert witnesses. Specifically, he argues that the trial court discarded its neutral role when it impermissibly questioned the witnesses as to their qualifications as experts.
Ward did not object to the trial court's qualification of the expert witnesses. Thus, we will review his allegation for plain error. Rule 45A, Ala.R.App.P.
Rule 614(a), Ala.R.Evid., provides that "[t]he [trial] court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." Rule 614(b), Ala.R.Evid., states that "the [trial] court may interrogate witnesses, whether they were called by the [trial] court or by a party." See also Rule 19.2(a) and (b)(2), Ala.R.Crim.P. The commentary to Rule 614, Ala.R.Evid., provides:
 "The trial judge may not question a witness in such a way as to indicate partiality for a party or as to indicate the judge's own feelings with regard to the credibility of a witness. To do so is to abandon the proper judicial role, by taking on the profile of an advocate; to do so would be an abuse of discretion and could lead to a reversal on appeal. See, e.g., Amatucci v. Delaware Hudson Ry., 745 F.2d 180 (2d. Cir. 1984) (indicating that the judge may not ask irrelevant questions); Moore v. United States, 598 F.2d 439 (5th Cir. 1979) (the trial judge, after questioning witnesses, should remind jurors that they are the sole factfinders in the case); United States v. Hickman, 592 F.2d 931 (6th Cir. 1979) (conviction of defendant reversed where the trial judge interjected himself into the trial proceedings more than 250 times and intimated a disbelief in the story of the defense). See also Richardson v. State, 403 So.2d 293 (Ala.Cr.App.), aff'd, 403 So.2d 297
(Ala. 1981)."
In Coleman v. State, 516 So.2d 871 (Ala.Cr.App. 1987), the appellant argued that the trial court had improperly questioned witnesses, thus preventing her from receiving a fair trial. In rejecting that contention, this Court replied:
 "'A trial judge may "pose questions to a witness for the purpose of clarifying the issues for the jury's consideration and to aid in the orderly conduct of the trial process." Richardson v. State, 403 So.2d 297
(Ala. 1981). "The trial judge has the right to propound such questions to witnesses as may be necessary to elicit certain facts, . . .; and it not only is the court's prerogative to so act, but its duty, if the court deems it necessary to elicit proper evidence bearing on the issues." Rice v. Hill, 278 Ala. 342, 343, 178 So.2d 168, 169 (1965) (citations omitted). "[W]ith certain exceptions, no rule of law exists which limits the power of a judge in a criminal trial to interrogate a witness during his examination. He may ask any question which either the state or the accused had the right to ask, but which has been omitted, if the answer may be relevant." Holmes v. State, 22 Ala. App. 373, 115 So. 849
(1928). "The unquestioned province of the court — in fact, the solemn and sacred duty of a trial judge — is the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any *Page 918 
 relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other." Brandes v. State, 17 Ala. App. 390, 391, 85 So. 824, 825 (1920).' Timmons v. State, 487 So.2d 975, 981 (Ala.Cr.App.), cert. denied, 487 So.2d 975
(Ala. 1986)."
Coleman, 516 So.2d at 873. As long as the trial court's questions do not divulge its opinion of the evidence and serve to clarify the testimony of the witness or to bring out additional relevant facts, questioning by the trial court is permissible. See Coleman, 516 So.2d at 873, citing Hardyv. State, 455 So.2d 265 (Ala.Cr.App. 1984), and Bradley v. State,494 So.2d 750 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986). Matters regarding the qualifications of experts are always relevant to the trial court. See Coleman, supra.
Our review of the record indicates that the trial court did not deny Ward a fair trial by impermissibly questioning the expert witnesses. In this case, Ward objected to the lack of predicate to admit the testimony of Dr. Harold Reed, the state's pediatric expert, and the trial court asked him whether he was licensed to practice medicine in the State of Alabama, whether he had completed a residency internship, and whether he was board-certified. After Dr. Reed answered, the trial court then accepted Dr. Reed as an expert witness. (R. 723.) The same situation arose with the state's medical examiner, Dr. James Downs. After defense counsel objected on the ground that the state had not laid a proper predicate, the trial court, after Dr. Downs answered its question concerning whether he was licensed to practice medicine in the State of Alabama, admitted him as an expert witness in this case. (R. 1359.) Additionally, the trial court issued an instruction to the jury not to consider any comment the trial court made during the trial in determining its verdict. (R. 1722-23.)
Given that the trial court asked neutral questions concerning the credentials of Dr. Reed and Dr. Downs, we cannot say that the trial court disregarded its duty of impartiality. Thus, the trial court did not err in questioning the expert witnesses, as to their qualifications. Furthermore, because Ward failed to establish that there was any error in the admission of the testimony or that he was substantially prejudiced by its admission, we conclude that no plain error occurred. Rule 45A, Ala.R.App.P.
 VI.
Ward maintains that, under Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied due process because, he says, the state failed to timely comply with the trial court's discovery order concerning alleged exculpatory evidence. Specifically, he refers to a "Child Abuse or Neglect" report from the Department of Human Resources.
Although defense counsel made a general objection, stating that he had not received the information in a timely manner, he did not specifically state that a Brady violation occurred or that Ward's case was prejudiced by the lateness of the production of the report. Thus, we will review this issue for plain error. Rule 45A, Ala.R.App.P.
In Coral v. State, 628 So.2d 954 (Ala.Cr.App. 1992), aff'd,628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387,128 L.Ed.2d 61 (1994), this Court stated:
 "In Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1197, the Supreme Court held that `the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to *Page 919 
 guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' To establish a Brady violation, a defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). `Materiality' requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A `reasonable probability' is one sufficient to undermine confidence in the result. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United States v. Burroughs, 830 F.2d 1574 (11th Cir. 1987), cert. denied, Rogers v. United States, 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); Ex parte Dickerson, 517 So.2d 628 (Ala. 1987); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App. 1991).
 "Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial. United States v. Gordon, 844 F.2d 1397 (9th Cir. 1988); United States v. Shelton, 588 F.2d 1242 (9th Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); Ex parte Raines, 429 So.2d 1111 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368
(1983); McClain v. State, 473 So.2d 612 (Ala.Cr.App. 1985). A delay in disclosing Brady material requires reversal only if `the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial.' United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379
(1976))."
628 So.2d at 980. "`There is no Brady violation where the information in question could have been obtained by the defense through its own efforts.'" Freeman v. State, 722 So.2d 806, 810-11 (Ala.Cr.App. 1998), quoting Johnson v. State, 612 So.2d 1288, 1294 (Ala.Cr.App. 1992).
In this case, the trial court ordered that any exculpatory information and any statements made by Ward to officers and agents of the state should be produced before trial. During the testimony of Chuck Matchett, a Baldwin County Department of Human Resources employee, the prosecution questioned Matchett concerning a "Child Abuse or Neglect" report. Defense counsel objected, stating that he had not received the report before trial. The prosecutor, John Whetstone, stated that he thought his staff had given the information to the defense. The trial court sustained the objection and did not permit the prosecution to introduce the report at trial. Matchett did not testify concerning the report. Judy Newcomb, an assistant district attorney, stated that, before trial, she discussed the report with defense counsel, and that defense counsel told her that he was not sure whether he had the report in his file. Newcomb further stated that she told defense counsel to look for the report, and that, if he did not have it, to notify her and she would give the report to the trial court for an in camera review. According to Newcomb, defense counsel did not contact her concerning the report and she assumed that he had the report in his possession. Defense counsel conceded that he and the prosecution had miscommunicated. During a recess, the trial *Page 920 
court conducted an in camera review of the report and determined that the report contained exculpatory information. The trial court provided the report to the defense and told defense counsel that he would be given extra time to review the report before cross-examining Matchett. Defense counsel declined to use the extra time to review the report before the cross-examination of Matchett, and requested that the trial court issue an instanter subpoena for Matchett in the event that he needed to examine him later in the trial. The trial court granted the request, but defense counsel did not recall Matchett.
Given that the prosecution discussed the report with defense counsel before trial and was not further contacted by the defense concerning the report, and that the trial court gave the defense time to review the report and issued an instanter subpoena, Ward has not established that the lateness of the disclosure so prejudiced defense counsel's preparation or presentation of his defense that he was prevented from receiving a fair trial. The defense and the prosecution obviously had miscommunicated concerning the report. Thus, there is no evidence that the prosecution intentionally withheld exculpatory information from the defense. Furthermore, the record does not indicate what information was contained in the report. Therefore, Ward has not established that a reasonable probability exists that the outcome of the proceedings would have been different had he received the report before trial.
Based on the foregoing, we find no due process violation under Brady
and no plain error.
 VII.
Ward contends that the trial court committed plain error in refusing to appoint an expert witness to testify for the defense concerning the cause of death. Ward did not file a motion for funds for a forensic expert; therefore, we will review his argument under the plain error standard. Rule 45A, Ala.R.App.P.
In Whitehead v. State, [Ms. CR-95-2129, August 27, 1999] 777 So.2d 781
(Ala.Cr.App. 1999), this Court stated:
 "In Ex parte Dobyne, 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), the Alabama Supreme Court stated:
 "`[I]n Dubose v. State, 662 So.2d 1189 (Ala. 1995), this Court held that the Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985),] principles relating to assistance of experts are not limited to psychiatrists. The Ake principles, which are grounded in the due process guarantee of fundamental fairness, apply to assistance by nonpsychiatric experts when an indigent defendant makes a proper showing that the requested assistance is needed in order for the defendant to have "a fair opportunity to present his defense." Dubose, 662 So.2d at 1194. Specifically, a defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. Dubose, 662 So.2d at 1191; see also, Smith v. State, 623 So.2d 369 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); McLeod v. State, 581 So.2d 1144
(Ala.Cr.App. 1990); Siebert v. State, 562 So.2d 586
(Ala.Cr. *Page 921 
 App. 1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408
(1990); Stewart v. State, 562 So.2d 1365
(Ala.Cr.App. 1989); McGahee v. State, 554 So.2d 454
(Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala. 1989).'
"672 So.2d at 1357-58."
Whitehead, 777 So.2d at 797. See also Boyd v. State, 542 So.2d 1247
(Ala.Cr.App. 1988) (holding that defendant was not entitled to an expert witness to testify concerning the injuries sustained by the victim where a state pathologist testified as to that issue).
In this case, Dr. Downs, the state medical examiner, testified that he conducted an autopsy on Nicholas's body on April 22, 1997. He testified concerning the cause of Nicholas's death, addressing the respective theories of both the state and Ward. Dr. Downs stated that, in his opinion, Nicholas died as the result of blunt-force injuries and suffocation. During cross-examination, Dr. Downs testified that, although Ward's theory that Nicholas could have been asphyxiated by being trapped upside-down between the recliner and the bed was plausible, there were no linear bruises or marks on the front or back of Nicholas's body that would indicate that such an incident happened. Dr. Downs testified that because Nicholas had two broken arms and several fractured ribs, it was possible that he could have laid on his face and suffocated himself. However, Dr. Downs stated that, considering the totality of the circumstances, it was his opinion that suffocation occurred by some external force, such as a pillow being held over Nicholas's face or by someone pinching his nose and holding his mouth closed.
Given that Dr. Downs addressed the theories of both the state and Ward, and that Dr. Downs testified that Nicholas's death was caused by both suffocation and blunt-force injuries, we conclude that the appointment of an additional expert witness would not have resulted in a different outcome and that, therefore, the lack of an expert witness for the defense did not result in a fundamentally unfair trial. Thus, we conclude no plain error occurred when the trial court did not provide funds for an additional expert to testify at trial concerning the cause of Nicholas's death.
 VIII.
Ward contends that his trial counsel was ineffective. Specifically, he argues that trial counsel was ineffective for failing to file a motion for funds to obtain an expert to testify concerning the cause of death.
This issue was not raised in a motion for a new trial. Thus, we will review Ward's contention only for plain error. Rule 45A, Ala.R.App.P.
The law is well settled that in order to prevail on a claim of ineffective assistance of counsel, an appellant must meet the two-pronged test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). First, the appellant must show that his trial counsel's performance was deficient. This deficiency must rise to such a high level that the alleged errors of counsel effectively prevented counsel from functioning as the counsel guaranteed under the Sixth Amendment, which subsequently, would result in the defendant being denied a fair trial. Id. at 687, 104 S.Ct. at 2064. The defendant must also establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. This reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. Id. at 694,104 S.Ct. at 2068; see also Humphrey v. State, *Page 922 605 So.2d 848 (Ala.Cr.App. 1992). The burden rests on the defendant to show that trial counsel rendered ineffective assistance. Brownv. State, 663 So.2d 1028, 1032 (Ala.Cr.App. 1995).
In Lawhorn v. State, 756 So.2d 971 (Ala.Cr.App. 1999), this Court stated:
 "While counsel has a duty to investigate for evidence favorable to the defendant, `this duty only requires a reasonable investigation.' Singleton v. Thigpen, 847 F.2d [668,] 669 [(11th Cir. 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989)] (emphasis added). Counsel's obligation is to conduct a `substantial investigation into each of the several plausible lines of defense.' Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). Furthermore, the reasonableness of trial counsel's investigation may be determined by information provided by the defendant. Id., 466 U.S. at 691, 104 S.Ct. at 2066."
As discussed in Part VII of this opinion, our review of the record indicates that Ward did not make a threshold showing that the appointment of an expert witness would have resulted in a different outcome and that the failure to appoint an expert resulted in a fundamentally unfair trial. Thus, Ward has not overcome his burden of establishing that his trial counsel's performance was deficient. Furthermore, Ward has not demonstrated that a defense expert's testimony would have differed from the testimony of Dr. Downs.[4] Thus, Ward has failed to establish a reasonable probability that, but for trial counsel's failure to pursue expert assistance concerning the cause of Nicholas's death, the outcome of his trial would have been different.
 IX.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Ward's capital murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in either the guilt phase or the sentencing phase of Ward's trial.
We have also reviewed Ward's sentence in accordance with §13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Ward's capital murder conviction, we also review the propriety of the death sentence. Our determination must include a review of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in this case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we ascertain: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Ward of the capital offense charged in the indictment, a *Page 923 
separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning the aggravating circumstances and the mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, and its responsibility in returning an advisory verdict, the jury recommended, by a vote of 10-2, a sentence of death by electrocution.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to determine whether it would sentence Ward to death as the jury recommended or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any nonstatutory mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Ward's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: the trial court determined beyond a reasonable doubt that the capital offense committed by Ward was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975.
The trial court did not find the existence of any statutory mitigating circumstances. See § 13A-5-51, Ala. Code 1975. However, the trial court found the existence of one nonstatutory mitigating circumstance: Ward had been abused by his father as a child.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, the advisory verdict of the jury, and after weighing the aggravating circumstance against any statutory and nonstatutory mitigating circumstances, the court determined that the aggravating circumstance outweighed the mitigating circumstance. Accordingly, the trial court properly sentenced Ward to death. We conclude that the trial court's findings concerning the aggravating circumstance and the mitigating circumstance are supported by the evidence.
This aggravating circumstance is fully supported by the record. Minorv. State, supra; and Dunaway v. State, supra. Dr. Downs, the forensic pathologist who performed the autopsy, testified that he had examined hundreds of children's bodies to determine the cause of death. According to Dr. Downs, the injuries suffered by Nicholas were extremely painful, more numerous, and more excessive than the injuries to any of the other bodies he had analyzed under similar situations. Dr. Downs testified that although the ultimate cause of Nicholas's death was suffocation and multiple blunt-force injuries, Nicholas suffered extensive injuries over a period of time that contributed to his death. The autopsy indicated that Nicholas was malnourished and that he had not been fed for several hours before he died. Nicholas had old and new bruises on his chest, abdomen, right knee, and right and left legs.[5] The gum line in Nicholas's mouth *Page 924 
was torn. Many of the abrasions on Nicholas's neck, abdomen, and back were pink, indicating that they had occurred close to the time of death. Although several of the fractures to his left arm and seven of his ribs occurred a few weeks before Nicholas's death, Nicholas suffered a spiral fracture to his right arm and at least one rib fracture within 48 to 72 hours of his death. Internal injuries to Nicholas indicated that Nicholas had suffered battered child syndrome within the last two months of his life.
Dr. Downs further testified that the injuries to Nicholas's face, which had been recently inflicted, were consistent with an object being continuously pushed down over his nose and mouth. Dr. Downs stated:
 "In my opinion, [the suffocation of Nicholas] would be more consistent with something being held over [his] face.
". . . .
 "It takes about 20 or 30 seconds to lose consciousness from cutting off the airway cutting off the oxygen. So the body has a drive to get oxygen into the system so for 30 — 20, 30 seconds, the body is working to try to get oxygen into the system.
 "After that 30 seconds, the body will go limp, unconscious. In order to die from suffocation you have to continue to apply the force after the child stopped moving and at some point within several minutes, the child is going to die, the body will die from those injuries."
(R. 1399-1400.) Dr. Downs testified that in his opinion the tears in the blood vessels in Nicholas's lungs indicate that while Nicholas was being suffocated, he was trying hard to get oxygen and live. According to Dr. Downs, the injuries suffered by Nicholas were inflicted over an extended period of time and were extremely painful.
Based on the evidence presented, the trial court's finding of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" was adequately supported by the record. The cruelty exercised upon Nicholas is clearly demonstrated by the nature and extent of his physical injuries. These injuries caused Nicholas intense and severe pain before he died. The physical abuse and neglect were significantly more ruthless than that required to commit murder. Clearly, the trial court appropriately used the evidence before it to conclude that this offense was "especially heinous, atrocious, or cruel." See Minor, supra, citing Bui v. State, 551 So.2d 1094, 1117 (Ala.Cr.App. 1988), aff'd, 551 So.2d 1125 (Ala. 1989), vacated on unrelated grounds,499 U.S. 971, 11 S.Ct. 1613, 113 L.Ed.2d 712 (1991), remanded,627 So.2d 848 (Ala. 1991).
Ward was convicted of one count of the offense of murder committed against a child less than 14 years of age. This offense is defined by statute as a capital offense. See § 13A-5-40(15), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Minor v. State, 780 So.2d 707
(Ala.Cr.App. 1999); and Dunaway v. State, 746 So.2d 1021 (Ala.Cr.App. 1998).
After carefully reviewing the record of the guilt phase and the sentencing phase of Ward's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are abundantly supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that death is the appropriate sentence in this case. Considering the *Page 925 
crime committed by Ward, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Ward's conviction and his sentence of death are affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
[1] The record indicates that the jury was shown a series of still images on the videotape.
[2] The video shows the victim's internal injuries by displaying the removed ribs. Thus, the victim is never observed cut open.
[3] Additionally, Downs testified that it was possible that Nicholas, however, was suffocated by someone pinching his lips and nose. He stated that he believed that it was more likely that Nicholas was suffocated by a pillow being held over his face.
[4] Although Ward asserted on appeal that Dr. Downs's testimony varied on the cause of death, our review of the record indicates that Dr. Downs consistently testified that Nicholas died from both blunt force injuries and suffocation.
[5] Dr. testified that the oldest bruises had been inflicted within a week of Nicholas's death.